**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2010 SEP 30 AM 10: 01

CLERK

BY———————
DEPUTY CLERK

)
DAN M. HOROWITZ, Individually And )
On Behalf of All Others Similarly Situated, )
)          CIVIL ACTION NO. _2 10.CV· 227_
Plaintiff, )
)
vs. )
)          CLASS ACTION COMPLAINT
)          FOR VIOLATIONS OF
GREEN MOUNTAIN COFFEE ROASTERS )   FEDERAL SECURITIES LAWS
INC., LAWRENCE J. BLANFORD, )
FRANCES G. RATHKE, )
RICHARD SCOTT MCCREARY and )
MICHELLE V. STACY, )
)          **JURY TRIAL DEMANDED**
Defendants )
)

## INTRODUCTION

1.      This is a federal class action on behalf of purchasers of the common stock of

Green Mountain Coffee Roasters, Inc ("Green Mountain " or the "Company") between **July 28,**

**2010, and September 28, 2010,** inclusive (the "Class Period"), seeking to pursue remedies

under the Securities Exchange Act of 1934 (the "Exchange Act"). As alleged herein, defendants

published a series of materially false and misleading statements that defendants knew and/or

recklessly disregarded were materially false and misleading at the time of such publication, and

that omitted to reveal material information necessary to make defendants' statements, in light of

such material omissions, not materially false and misleading.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

4.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Green Mountain  maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

5.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.     Plaintiff **DAN M. HOROWITZ**, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Green Mountain  at artificially inflated prices during the Class Period and has been damaged thereby.

7.     Defendant **GREEN MOUNTAIN COFFEE ROASTERS INC.** is a corporation organized under the laws of the state of Delaware, which maintains its principal place of business at 33 Coffee Lane, Waterbury, VT 05676.  According to the Company's profile listed on *Yahoo.com/finance*, Green Mountain operates in the specialty coffee industry in the United States and internationally.  It sells approximately 200 whole bean and ground coffee selections,

2

cocoa, teas, and coffees. The Company offers Arabica bean coffee, including single-origin, Fair Trade Certified, organic, flavored, limited edition, and proprietary blends under the Green Mountain Coffee, Tully's Coffee, and Newman's Own Organics brand names. It also manufactures gourmet single-cup brewing systems and markets its patented single-cup coffee and tea brewing systems for offices and homes under the Keurig brand name. The Company markets coffee, tea, cocoa, and single-cup brewers to retailers, such as department stores and club stores; and single-cup brewers to distributors, as well as to supermarkets

8.    Defendant **LAWRENCE J. BLANFORD** ("Blanford") is, and during the Class Period was, Chief Executive Officer and President of the Company. During the Class Period, defendant Blanford signed and certified the Company's Form 10-Q.

9.    Defendant **FRANCES G. RATHKE** ("Rathke") is, and during the Class Period was, Chief Financial Officer, Treasurer and Vice President of the Company. During the Class Period, defendant Rathke certified the Company's Form 10-Q.

10.    Defendant **RICHARD SCOTT MCCREARY** ("McCreary") is, and during the Class Period was President of the Company's Specialty Coffee Business Unit. During the Class Period, defendant McCreary sold over $6.9 million of his personally held Company stock while in possession of material, adverse, non-public information about the Company.

11.    Defendant **MICHELLE V. STACY** ("Stacy") is, and during the Class Period was President of the Company's Keurig Inc. unit. During the Class Period, defendant Stacy sold over $1.5 million of her personally held Company stock while in possession of material, adverse, non-public information about the Company.

12.    The defendants referenced above in ¶¶8-11 are referred to herein as the "Individual Defendants."

3

13.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Green Mountain 's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company – and their access to material, non-public information available to them – the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.    The Individual Defendants are liable for the false and misleading statements pleaded herein.

14.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Green Mountain common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (a) deceived the investing public regarding Green Mountain 's business, operations, management, and the intrinsic value of Green Mountain common stock; (b) enabled defendants to artificially inflate the price of Green Mountain shares; (c) enabled Green Mountain to sell $250 million of Company shares to Lavazza, while defendants were in possession of material, adverse, non-public information about the Company; (d) enabled Green Mountain insiders to sell millions of dollars of their privately held Green Mountain  shares while in possession of material, adverse, non-public information about the Company; and, (e) caused plaintiff and other members of the Class to purchase Green Mountain common stock at artificially inflated prices.

4

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

15.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of Green Mountain between **July 28, 2010, and September 28, 2010,** inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

16.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Green Mountain common shares were actively traded on the Nasdaq. As of August 2, 2010, the Company had over 131.946 million shares of common stock issued and outstanding. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Green Mountain or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

17.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

18.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

5

19.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Green Mountain ; and,

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

20.     A class action is superior to all other available methods for the fair and  efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### SUBSTANTIVE ALLEGATIONS

#### Defendants' Materially False and Misleading
#### Statements Made During the Class Period

21.     **3Q:10 Results: "Continued Strong Sales And Earnings Growth" Announced**. On July 28, 2010, the inception of the Class Period, defendants published a release announcing purported results for the third quarter of 2010, ended June 30, 2010.  This release stated, in part, the following:

6

GREEN MOUNTAIN COFFEE ROASTERS, INC. REPORTS CONTINUED STRONG SALES AND EARNINGS GROWTH FOR FISCAL 2010 THIRD QUARTER

64% Net Sales Growth Driven by Success of Keurig® Single-Cup Brewing System; Q3 2010 GAAP EPS of $0.13 and Non-GAAP EPS of $0.19; Company Provides Initial Outlook For Fiscal 2011

WATERBURY , VT (July 28, 2010) – Green Mountain Coffee Roasters, Inc., (NASDAQ: GMCR) today announced its fiscal 2010 third quarter results for the thirteen weeks ended June 26, 2010.

Net sales for the third quarter of fiscal 2010 increased 64% to $311.5 million as compared to $190.5 million reported in the third quarter of fiscal 2009. According to Generally Accepted Accounting Principles ("GAAP"), net income for the third quarter of fiscal 2010 totaled $18.6 million, or $0.13 per fully diluted share.

Excluding transaction-related expenses incurred in the quarter, and the resulting tax effect of reversing the tax benefit associated with previously incurred acquisition-related expenses, the Company's non-GAAP net income for the third quarter of fiscal 2010 was $25.8 million, or $0.19 per diluted share, representing an increase of 82% from $14.1 million, or $0.12 per diluted share, in the third quarter of fiscal 2009.1

The Company completed its acquisition of Diedrich Coffee Inc. ("Diedrich") on May 11, 2010 for $35 per share of common stock in a transaction with a total value of approximately $300 million.

\* \* \*

The Company completed a three-for-one stock split during the third quarter, effected in the form of a stock dividend. Shareholders of record at the close of business on May 10, 2010 received two additional shares of common stock for every one share of common stock held on that date.

22.     Regarding the Company's purported Costs, Margins and Income, the July 28,

2010 release also stated, in part, the following:

Costs, Margins and Income

Third quarter 2010 gross profit increased to 35.2% of total net sales compared to 33.6% for the corresponding quarter in 2009. This was as a result of higher manufacturing gross margin derived from the increase in volume of the Company's manufactured K-Cups as a percentage of total system volume.

7

During the third quarter, the Company experienced continued higher levels of warranty expense and sales returns related to a quality issue associated with certain brewer models produced primarily in late calendar 2009. As previously disclosed, the Company implemented hardware and software changes which it believes has corrected the issue. The Company reached agreement with its suppliers and will recover approximately $6 million as reimbursement related to this issue. This recovery was reflected in the third quarter cost of sales as a reduction to warranty expense and substantially offsets the higher warranty expense and sales returns costs incurred in the fiscal third quarter.

Selling, general and administrative expenses as a percentage of net sales for the third quarter were 23.0% as compared to 21.7% in the prior year. Third quarter 2010 general and administrative expenses include $4.0 million related to the Diedrich acquisition as well as the amortization of identifiable intangibles of $4.3 million due to the Company's prior acquisitions as compared to $1.5 million in the prior year third quarter.

The Company increased its GAAP operating income by 68%, to $38.2 million, in the third quarter of fiscal 2010, as compared to $22.8 million in the year ago quarter, and improved its GAAP operating margin to 12.3% from 12.0% in the prior year period. Excluding the impact of the $4.0 million transaction-related expenses in the third quarter of fiscal 2010, the Company's non-GAAP operating income was up 85% to $42.2 million and represented 13.5% of sales compared to $22.8 million, or 12.0% of sales in the prior year.

Interest expense was $1.5 million in the third quarter of fiscal 2010, compared to $1.1 million in the prior year quarter.

Income before taxes for the third quarter of fiscal 2010 increased 70% to $36.7 million as compared to $21.7 million in the third quarter of fiscal 2009.

The Company's tax rate for the fiscal third quarter was 49.5% as compared to 34.7% in the prior year quarter reflecting the tax effect of the recognition of the estimated total $12 million non-deductible acquisition-related expenses incurred during the Company's first, second and third quarters of fiscal 2010 for the Diedrich acquisition which closed during the Company's fiscal third quarter.

23. In addition to the foregoing, the July 28, 2010 release also quoted defendant

Blandford, in part, as follows:

Lawrence J. Blanford, GMCR's President and CEO, said, "In our fiscal third quarter, through the strong efforts of all our employees, we delivered excellent results on our key financial performance metrics including revenue, gross margin, operating margin and net income. We have now achieved 11 consecutive quarters of better than 40 percent net sales growth. For the first nine months of fiscal 2010

8

we have produced net sales growth of 70% and non-GAAP earnings per share growth of 89% over the same period for fiscal year 2009."

"Continued execution of our strategic business initiatives, including most recently, our acquisition of Diedrich, is driving GMCR's growth and enabling us to advance adoption and awareness of our growing portfolio of compelling brands," said Blanford. "We believe the inherent strength of our business model, combined with our passionate employees, the strong support of our business partners and our fervent belief that we can transform the way the world views business are key drivers behind our growth and success.

Blanford concluded, "The coming holiday buying season is shaping up to be another exciting opportunity for us to help more consumers discover and enjoy outstanding beverages with the convenience and choice of the Keurig Single-Cup brewing system. We are looking for a strong kickoff to our fiscal year 2011 and are providing our initial fiscal year 2011 estimate for sales growth in a range of between 44% to 50% and earnings per share of $1.15 to $1.20."

24.     The July 28, 2010 release also provided purported forward guidance, in part, as

follows:

Business Outlook and Other Forward-Looking Information

Fourth Quarter and Fiscal Year 2010

With one quarter remaining, the Company has refined its outlook for its fiscal year 2010 and is providing its first estimates for its fourth quarter of fiscal 2010. It now expects:

Total fiscal fourth quarter consolidated net sales growth of 58% to 63% resulting in total fiscal 2010 consolidated net sales growth of 66% to 68%, compared to the prior estimate of 62% to 65%.

Total fiscal 2010 K-Cup portion packs shipped system-wide by all Keurig licensed roasters to increase in the range of 73% to 76%, compared to prior estimate of 73% to 78%.

Fiscal fourth quarter non-GAAP operating margin in the range of 13.0% to 13.5%, resulting in a total fiscal 2010 non-GAAP operating margin in the range of 12.1% to 12.5% excluding acquisition-related transaction expenses.

Fiscal 2010 interest expense of $5.5 million to $6.5 million.

A tax rate of 39.2% for the fiscal year excluding the tax impact of expenses related to the Timothy's and Diedrich acquisitions.

Fiscal fourth quarter fully diluted non-GAAP earnings per share in the range of $0.18 to $0.20 per share, resulting in total fiscal 2010 fully diluted non-GAAP earnings per share in the range of $0.69 to $0.71 per share, excluding any acquisition-related transaction expenses. The fully diluted non-GAAP earnings per share estimate of $0.69 to $0.71 for the 2010 fiscal year includes $15 million pre-tax or $0.07 per diluted share non-cash amortization expenses related to the identifiable intangibles of the Company's acquisitions.

Capital expenditures for fiscal 2010 in the range of $120 to $140 million, as compared to prior estimates in the range of $105 to $125 million.

Depreciation and amortization expenses in the range of $44 to $46 million for fiscal year 2010, including $15 million for amortization of identifiable intangibles, up from prior estimates of $40 to $44 million.

First Issue of Company Estimates for Fiscal Year 2011

The company also is providing its first estimates for fiscal year 2011:

Total consolidated net sales growth of 44% to 50%.

Total K-Cup portion packs shipped system-wide to increase in the range of 64% to 68%.

Fully diluted earnings per share in the range of $1.15 to $1.20 per share, representing an increase in the range of 62% to 74% over fiscal year 2010's fully diluted non-GAAP earnings per share estimate range of $0.69 to $0.71 per share. The fiscal 2011 estimate includes approximately $22 million, or approximately $0.09 per share, of non-cash amortization expenses related to the identifiable intangibles mentioned above.

25.     Shares of the Company rallied on this positive news. As evidence of this, shares of Green Mountain traded from a close of $28.67 per share on July 28, 2010, prior to the publication of these purported "strong" financial and operational results, to a close of $31.36 per share the following day, after publication of these results.

26.     Taking full advantage of the artificial inflation in the price of Company shares caused as a result of the publication by defendants of the materially false and misleading information about the Company cited, in part, above, defendants then announced that they had

10

entered into an agreement to sell approximately $250 million of Company stock to Lavazza.

Accordingly, on August 10, 2010, defendants published a release that stated, in part, the

following:

> GREEN MOUNTAIN COFFEE ROASTERS, INC. ANNOUNCES $250 MILLION COMMON STOCK PURCHASE AGREEMENT WITH LUIGI LAVAZZA S.p.A
>
> Companies to Work Toward Development, Marketing and Distribution Agreement
>
> WATERBURY, Vt., and TORINO, Italy, August 10, 2010 – Green Mountain Coffee Roasters, Inc. (GMCR) (NASDAQ: GMCR) and Luigi Lavazza S.p.A (Lavazza) announced the companies have entered into a $250 million common stock purchase agreement. Under terms of the agreement, Lavazza has agreed to purchase $250 million in aggregate purchase price of newly issued shares of GMCR's $0.10 par value Common Stock, or approximately 7% of GMCR's current outstanding shares, at a price per share equal to the 60 day volume weighted average price ("VWAP") at closing minus 7.5%. This investment requires approval under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and is expected to close in September 2010.
>
>                  \*   \*   \*
>
> The common stock purchase agreement provides that Lavazza (1) not sell the purchased shares for a year and then thereafter only in open-market transactions or to certain institutional investors, (2) vote these shares in concert with the Company's Board, (3) may have an observer at the Company's Board meetings and, (4) in the future and under certain circumstances, a right to designate a Board member. In addition, the Agreement contains a 5-and-one-half-year customary standstill period, subject to certain exceptions after a one-year period, including the right to purchase additional shares up to 15% of the Company's outstanding shares.

27. The August 10, 2010 release also quoted defendant Blanford, in part, as follows:

> "Lavazza's investment in GMCR reflects their confidence in our strategy, vision and execution and provides enhanced financial flexibility to fund our growth and future enabling initiatives," said Lawrence J. Blanford, president and CEO, Green Mountain Coffee Roasters, Inc. "We have developed an effective working relationship with Lavazza and, based on the impressive quality of the Lavazza people and technology, we believe there is strong potential for a commercial alliance between GMCR and Lavazza that will leverage our complementary coffee systems and respective geographic strengths."

28.    **3QF:10 Form 10-Q.**    As shares of Green Mountain  continued to trade at

artificially inflated levels, on August 10, 2010, defendants filed with the SEC the Company's

3QF:10 Form 10-Q, for the fiscal quarter ended June 30, 2010, signed and certified by

defendants Blanford and Rathke.    In addition to making substantially similar statements

concerning the Company operations, including revenues, expenses, costs, and ratios, as had been

published previously, the 3QF:10 Form 10-Q also provided statements concerning the

Company's Significant Accounting Policies and the Basis of its Accounting Presentation, in part,

as follows:

### 1.    **Basis of presentation**

The accompanying unaudited consolidated financial statements have been
prepared in accordance with generally accepted accounting principles for interim
financial information, the instructions to Form 10-Q, and Rule 10-01 of
Regulation S-X. Accordingly, they do not include all of the information and
footnotes required by generally accepted accounting principles for complete
consolidated financial statements.

In the opinion of management, all adjustments considered necessary for a fair
presentation of the interim financial data have been included. Results from
operations for the thirteen and thirty-nine week periods ended June 26, 2010 are
not necessarily indicative of the results that may be expected for the fiscal year
ending September 25, 2010.

The September 26, 2009 balance sheet data was derived from audited financial
statements but does not include all disclosures required by accounting principles
generally accepted in the United States of America. For further information, refer
to the consolidated financial statements and the footnotes included in the annual
report on Form 10-K for Green Mountain Coffee Roasters, Inc. for the fiscal year
ended September 26, 2009. Throughout this presentation, we refer to the
consolidated company as the "Company".

The Company has revised the classification of certain information presented in its
fiscal 2009 Unaudited Consolidated Balance Sheet to conform to its fiscal 2010
presentation.

12

29.    **Controls.** The Company's 3QF:10 Form 10-Q also contained representations that

attested to the purported effectiveness and sufficiency of the Company's controls and

procedures, as follows:

### Item 4.    Controls and Procedures

As of June 26, 2010, the Company's management with the participation of its
Chief Executive Officer and Chief Financial Officer conducted an evaluation of
the effectiveness of the design and operation of the Company's disclosure
controls and procedures pursuant to Rule 13a-15 and 15d-15 under the Securities
Exchange Act of 1934 (the "Exchange Act"). Based on that evaluation, our Chief
Executive Officer and Chief Financial Officer concluded that the Company's
disclosure controls and procedures (as defined in Rule 13a-15 of the Exchange
Act) are effective.

There have been no changes in the Company's internal control over financial
reporting during the most recent fiscal quarter that have materially affected, or are
reasonably likely to materially affect, the Company's internal control over
financial reporting.

30.    **Certifications.** In addition to the foregoing, the Company's 3QF:10 Form 10-Q

also contained certifications by defendants Blanford  and Rathke that attested to the purported

accuracy and completeness of the Company's financial and operational reports, as follows:

### CERTIFICATION PURSUANT TOSECURITIES EXCHANGE ACT RULES 13a-14 and 15d-14 AS ADOPTED PURSUANT TO SECTION 302 OF THE SARBANES-OXLEY ACT OF 2002

1.    I have reviewed this quarterly report on Form 10-Q of Green Mountain
Coffee Roasters, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement
of a material fact or omit to state a material fact necessary to make the statements
made, in light of the circumstances under which such statements were made, not
misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial
information included in this report, fairly present in all material respects the
financial condition, results of operations and cash flows of the registrant as of,
and for, the periods presented in this report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a.     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b.     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c.     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is
reporting; and

5.     The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: August 5, 2010

/s/ Lawrence J. Blanford
Lawrence J. Blanford
President and Chief Executive Officer

\*   \*   \*

Date: August 5, 2010
/s/ Frances G. Rathke
Frances G. Rathke
Chief Financial Officer

### CERTIFICATION PURSUANT TO
### 18 U.S.C. SECTION 1350,
### AS ADOPTED PURSUANT TO
### SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of Green Mountain Coffee Roasters, Inc. (the "Company") on Form 10-Q for the period ending June 26, 2010 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Lawrence J. Blanford, as the Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of my knowledge:

(1)     The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

Date: August 5, 2010
/s/ Lawrence J. Blanford
Lawrence J. Blanford
President and Chief Executive Officer

### CERTIFICATION PURSUANT TO
### 18 U.S.C. SECTION 1350,
### AS ADOPTED PURSUANT TO
### SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002

In connection with the Quarterly Report of Green Mountain Coffee Roasters, Inc. (the "Company") on Form 10-Q for the period ending June 26, 2010 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Frances G. Rathke, as the Chief Financial Officer of the Company, certify,

pursuant to 18 U.S.C. 1350, as adopted pursuant to section 906 of the Sarbanes-Oxley Act of 2002, that, to the best of my knowledge:

(1)     The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

(2)     The information contained in the Report fairly presents, in all material respects, the financial condition and result of operations of the Company.

Date: August 5, 2010
/s/ Frances G. Rathke
Frances G. Rathke
Chief Financial Officer

31.     The statements made by defendants and contained in the Company's July 28, 2010 release, its August 10, 2010, and in the Company's 3QF:10 Form 10-Q were each materially false and misleading when made, and were known by defendants to be false or were recklessly disregarded as such thereby, for the following reasons, among others:

(a)     At all times during the Class Period, it was not true that the Company's purported success was the result of its integration of acquisitions or defendants' competent management when, in fact, throughout the Class Period, defendants had propped up the Company's results by manipulating Green Mountain's accounting for revenues and income;

(b)     At all times during the Class Period, unbeknownst to investors, defendants had materially overstated the Company's profitability by failing to properly account for the Company's results of operations and by artificially inflating the Company's financial results;

(c)     Throughout the Class Period, it was also not true that Green Mountain contained adequate systems of internal operational or financial controls, such that Green Mountain 's reported financial statements were true, accurate, or reliable;

16

(d)     As a result of the foregoing, throughout the Class Period, it also was not true that the Company's financial statements and reports were prepared in accordance with GAAP ad SEC rules; and,

(e)     As a result of the aforementioned adverse conditions which defendants failed to disclose, throughout the Class Period, defendants lacked any reasonable basis to claim that Green Mountain  was operating according to plan, or that Green Mountain could achieve guidance sponsored and/or endorsed by defendants.

## THE TRUE FINANCIAL AND OPERATIONAL CONDITION
## OF GREEN MOUNTAIN  IS BELATEDLY DISCLOSED

32.     On August 28, 2010, the Company completed a sale of 8,566,649 shares of its common stock to Luigi Lavazza, for an aggregate purchase price of $250 million. The sale of the shares was effected pursuant to the Common Stock Purchase Agreement, dated as of August 10, 2010 (the "SPA"), by and between the Company and Lavazza.  Under terms of the agreement, Lavazza purchased $250 million of newly-issued shares of Green Mountain, at a price per share equal to the 60-day volume weighted average price ("VWAP") at closing minus 7.5%.

33.     Later, on August 28, 2010, however, following the close of trading, defendants shocked and alarmed investors after they published a release that revealed, for the first time, that the Company was the subject of an SEC investigation into its revenue recognition, that it had been notified by the SEC of this investigation as early as September 20, 2010, and that the Company was also expected to take a restatement charge in the near term - - rendering the Company's prior reported financial statements and reports unreliable, false, and materially misleading. This release stated, in part, the following:

17

SEC inquiry

On September 20, 2010, the staff of the SEC's Division of Enforcement informed the Company that it was conducting an inquiry and made a request for a voluntary production of documents and information. Based on the request, the Company believes the focus of the inquiry concerns certain revenue recognition practices and the Company's relationship with one of its fulfillment vendors. The Company, at the direction of the audit committee of the Company's board of directors, is cooperating fully with the SEC staff's inquiry.

\*   \*   \*

Intercompany adjustment correction

In connection with the preparation of its financial results for its fourth fiscal quarter, the Company's management discovered an immaterial accounting error relating to the margin percentage it had been using to eliminate the inter-company markup in its K-Cup inventory balance residing at its Keurig business unit. Management discovered that the gross margin percentage used to eliminate the inter-company markup resulted in a lower margin applied to the Keurig ending inventory balance effectively overstating consolidated inventory and understating cost of sales. Management determined that the accounting error arose during fiscal 2007 and analyzed the quantitative impact from that point forward to June 26, 2010.

34.    Following this announcement, shares of the Company immediately declined in

after-market trading, falling over 15% - - from a close of above $37.00 per share, to a low of

$31.25 per share. As evidence of this, *TheStreet.com*, a popular investor news website, stated in

part, the following:

Green Mountain Coffee Roasters Tanks on SEC Inquiry

NEW YORK (TheStreet) -- Shares of Green Mountain Coffee Roasters(GMCR) have plummeted by 15.4% to $31.25 in after-hours trading following the disclosure of an SEC inquiry into the company's revenue recognition practices.

In a 8-K filing, the following is stated: "On September 20, 2010, the staff of the SEC's Division of Enforcement informed the Company that it was conducting an inquiry and made a request for a voluntary production of documents and information. Based on the request, the Company believes the focus of the inquiry concerns certain revenue recognition practices and the Company's relationship with one of its fulfillment vendors. The Company, at the direction of the audit

committee of the Company's board of directors, is cooperating fully with the SEC staff's inquiry."

BGC Financial director and technical analyst Roger Volz said this revelation could be the beginning of a fundamental shift for Green Mountain Coffee Roasters -- "breathing life into the bears." Volz said it could be a game changer for the stock depending on how fast the company can get the inquiry settled.

The timing of the disclosure could be better -- it's occurring uncomfortably close to quarter-end.

"Now fund managers need to look at portfolio weightings, have to ask themselves whether they want to hold this position with this question arising," Volz said.

35.     In addition to the foregoing, at approximately the same time, Reuters also

reported, in part, the following:

Green Mountain says SEC probes accounts, shares fall

*       Says SEC inquires revenue recognition practices

*       Co says it is cooperating with SEC

*       Says finds accounting error affecting FY07 results

*       Error results in $4.4 mln overstatement of net income * Shares plunge 16 pct after market

Sept 28 (Reuters) - Green Mountain Coffee Roasters Inc (GMCR.O: Quote, Profile, Research, Stock Buzz) said U.S. regulators are conducting an inquiry into some of its revenue recognition practices and its relationship with a 'fulfillment' vendor, sending its shares down 16 percent.

The U.S. Securities and Exchange Commission's Division of Enforcement sought voluntary production of documents and information from the company, which said it is cooperating fully with the SEC staff.

Green Mountain also found an "immaterial" accounting error that arose during fiscal 2007, resulting in a $4.4 million overstatement of net income, or a 3 cents cumulative impact on earnings per share, the leader in the single-cup coffee brewer market said in a regulatory filing.

As of June 26, 2010, there was a cumulative $7.6 million overstatement of pretax income and Green Mountain expects the amount of the accounting correction to be made in the quarter ended Sept. 25.

19

Shares of Waterbury, Vermont-based Green Mountain fell as much as $5.95 to $31.06 in after-market trade Tuesday. They closed at $37.01 in regular trading on Nasdaq.

On Monday, the company's shares jumped to a lifetime high on rumours of a takeover by food giant Nestle SA.

## CAUSATION AND ECONOMIC LOSS

36.     During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated Green Mountain's stock price and operated as a fraud or deceit on Class Period purchasers of Green Mountain's stock by misrepresenting the Company's financial results. Throughout the Class Period, defendants improperly inflated the Company's financial results. Ultimately, however, when defendants' prior misrepresentations and fraudulent conduct came to be revealed and was apparent to investors, shares of Green Mountain declined precipitously - - evidence that the prior artificial inflation in the price of Green Mountain's shares was eradicated. As a result of their purchases of Green Mountain stock during the Class Period, plaintiff and other members of the Class suffered economic losses, *i.e.*, damages under the federal securities laws.

37.     By improperly characterizing the Company's financial results and misrepresenting its prospects, the defendants presented a misleading image of Green Mountain's business and future growth prospects. During the Class Period, defendants repeatedly emphasized the ability of the Company to monitor and control expenses, and consistently reported revenues, expenses and expense ratios within expectations and within the range for which the Company was adequately reserved. These claims caused and maintained the artificial inflation in Green Mountain's stock price throughout the Class Period and until the truth about the Company was ultimately revealed to investors.

20

38. On September 28, 2010, however, as investors learned the truth about the Company, and learned that defendants had failed to report the Company's financial and operational results, shares of the Company collapsed. Defendants' belated disclosures had an immediate, adverse impact on the price of Green Mountain shares.

39. These belated revelations also evidenced defendants' prior falsification of Green Mountain's business prospects due to defendants' false statements. As investors and the market ultimately learned, the Company's prior business prospects had been overstated as were the Company's results of operations. As this adverse information became known to investors, the prior artificial inflation began to be eliminated from Green Mountain's share price and were damaged as a result of the related share price decline.

40. The decline in Green Mountain's stock price at the end of the Class Period was a direct result of the nature and extent of defendants' fraud being revealed to investors and to the market. The timing and magnitude of Green Mountain's stock price decline negates any inference that the losses suffered by plaintiff and the other members of the Class was caused by changed market conditions, macroeconomic or industry factors or even Company-specific facts unrelated to defendants' fraudulent conduct.

41. The economic loss, *i.e.*, damages suffered by plaintiff and other members of the Class, was a direct result of defendants' fraudulent scheme to artificially inflate the price of Green Mountain's stock and the subsequent significant decline in the value of the Company's shares when defendants' prior misstatements and other fraudulent conduct was revealed. The dramatic decline in the price of Company shares immediately following defendants' belated disclosure is evidenced, in part, by the chart below:



## VIOLATIONS OF GAAP AND SEC REPORTING RULES

42.    During the Class period, defendants materially misled the investing public, thereby inflating the price of the Company's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its financial performance, accounting, reporting, and financial condition in violation of the federal securities laws and GAAP.

43.    GAAP consists of those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at the particular time.  Regulation S-X, to which the Company is subject as a registrant under the Exchange Act, 17 C.F.R.  210.4-01(a)(1), provides that financial statements filed with the SEC which are not prepared in compliance with GAAP, are presumed to be misleading and inaccurate.  SEC Rule 13a-13 requires issuers to file quarterly reports.

22

44.    SEC Rule 12b-20 requires that periodic reports contain such further information as is necessary to make the required statements, in light of the circumstances under which they are made, not misleading.

45.    In addition, Item 303 of Regulation S-K requires that, for interim periods, the Management Division and Analysis Section ("MD&A") must include, among other things, a discussion of any material changes in the registrant's results of operations with respect to the most recent fiscal year-to-date period for which an income statement is provided. Instructions to Item 303 require that the this discussion identify any significant elements of registrant's income or loss from continuing operations that are not necessarily representative of the registrant's ongoing business. Item 303(a)(2)(ii) to Regulation S-K requires the following discussion in the MD&A of a company's publicly filed reports with the SEC:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in relationship shall be disclosed.

Paragraph 3 of the Instructions to Item 303 states in relevant part:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past. . .

46.    The GAAP requirement for recognition of an adequate provision for foreseeable costs and an associated allowance applies to interim financial statements as required by Accounting Principles Board Opinion No. 28. Paragraph 17 of this authoritative pronouncement states that:

23

The amounts of certain costs and expenses are frequently subjected to year-end adjustments even though they can be reasonably approximated at interim dates. To the extent possible such adjustments should be estimated and the estimated costs and expenses assigned to interim periods so that the interim periods bear a reasonable portion of the anticipated annual amount.

47.     The Company's financial statements contained in the quarterly reports filed with the SEC on Forms 10-Q for the quarterly periods throughout the Class Period were presented in a manner that violated the principle of fair financial reporting and the following GAAP, among others:

(a)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1).

(b)     The principle that financial reporting should provide information about an enterprise's financial performance during a period (FASB Statement of Concepts No. 1).

(c)     The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2).

(d)     The principle of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2).

(e)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2).

(f)     The principle that contingencies and other uncertainties that affect the fairness of presentation of financial data at an interim date shall be disclosed in interim reports in the same manner required for annual reports (APB Opinion No. 28).

(g)     The principle that disclosures of contingencies shall be repeated in interim and annual reports until the contingencies and have been removed, resolved, or have become immaterial (APB Opinion No. 28).

(h)     The principle that management should provide commentary relating to the effects of significant events upon the interim financial results (APB Opinion No. 28).

48.     In addition, during the Class Period, defendants violated SEC disclosure rules:

(a)     by failing to disclose the existence of known trends, events, or uncertainties that they reasonably expected would have a material, unfavorable impact on net revenues or income, or that were reasonably likely to result in the Company's liquidity decreasing in a material way, in violation of Item 303 of Regulation S-K under the federal securities laws (17 C.F.R. 229.303), and that failure to disclose the information rendered the statements that were made during the Class Period materially false and misleading; and,

(b)     by failing to file financial statements with the SEC that conformed to the requirements of GAAP, which as a result, rendered such financial statements presumptively misleading and inaccurate pursuant to Regulation S-X, 17 C.F.R. 210.4-01(a)(1).

49.     Defendants were required to disclose, in the Company's financial statements, the existence of the material facts described herein and to appropriately recognize and report assets, revenues, and expenses in conformity with GAAP. The Company failed to make such disclosures and to account for and to report its financial statements in conformity with GAAP. Defendants knew, or were reckless in not knowing, the facts which indicated that all of the Company's interim financial statements, press releases, public statements, and filings with the SEC, which were disseminated to the investing public during the Class Period, were materially false and misleading for the reasons set forth herein. Had the true financial position and results

25

of operations of the Company been disclosed during the Class period, the Company's common stock would have traded at prices well below that which it did.

## ADDITIONAL SCIENTER ALLEGATIONS

50.     As alleged herein, defendants acted with scienter in that each defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and, knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Green Mountain, their control over, and/or receipt and/or modification of Green Mountain's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Green Mountain, participated in the fraudulent scheme alleged herein.

51.     Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because: (a) it deceived the investing public regarding Green Mountain 's business, operations, management, and the intrinsic value of Green Mountain common stock; (b) enabled defendants to artificially inflate the price of Green Mountain shares; (c) enabled Green Mountain to sell $250 million of Company shares to Lavazza, while defendants were in possession of material, adverse, non-public information about the Company; (d) enabled Green Mountain insiders to sell millions of dollars of their privately held Green Mountain shares while in possession of material, adverse, non-public information

about the Company; and, (e) caused plaintiff and other members of the Class to purchase Green
Mountain common stock at artificially inflated prices.

52.    Sales of Company shares by insiders that occurred during the Class Period
include, in part, the following:

## INSIDER TRANSACTIONS REPORTED DURING CLASS PERIOD

| Date | Insider | Shares | Type | Transaction | Value |
|------|---------|--------|------|-------------|-------|
| Sep 21, 2010 | STACY MICHELLE<br>Officer | 5,000 | Direct | Option Exercise at $6.20 –<br>$9.14 per share. | N/A |
| Sep 21, 2010 | STACY MICHELLE<br>Officer | 5,000 | Direct | Sale at $37 per share. | $185,000 |
| Sep 13, 2010 | STACY MICHELLE<br>Officer | 5,000 | Direct | Option Exercise at $6.20 per share. | $31,000 |
| Sep 13, 2010 | STACY MICHELLE<br>Officer | 5,000 | Direct | Sale at $35.40 per share. | $177,000 |
| Aug 18, 2010 | MCCREARY R.SCOTT<br>Officer | 200,000 | Direct | Option Exercise at $1.47 per share. | $294,000 |
| Aug 18, 2010 | MCCREARY R.SCOTT<br>Officer | 200,000 | Direct | Sale at $33.08 per share. | $6,616,000 |
| Aug 13, 2010 | STACY MICHELLE<br>Officer | 30,000 | Direct | Option Exercise at $6.20 per share. | $186,000 |
| Aug 13, 2010 | STACY MICHELLE<br>Officer | 30,000 | Direct | Sale at $30.95 per share. | $928,500 |

## Applicability Of Presumption Of Reliance:
## Fraud-On-The-Market Doctrine

53.    At all relevant times, the market for Green Mountain's common stock was an
efficient market for the following reasons, among others:

(a)    Green Mountain's stock met the requirements for listing, and was listed
and actively traded on the Nasdaq national market exchange, a highly efficient and automated
market;

27

(b)     As a regulated issuer, Green Mountain filed periodic public reports with the SEC and the Nasdaq;

(c)     Green Mountain regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and,

(d)     Green Mountain was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s). Each of these reports was publicly available and entered the public marketplace.

54.     As a result of the foregoing, the market for Green Mountain securities promptly digested current information regarding Green Mountain from all publicly available sources and reflected such information in Green Mountain's stock price. Under these circumstances, all purchasers of Green Mountain common stock during the Class Period suffered similar injury through their purchase of Green Mountain common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

55.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Green Mountain who knew that those statements were false when made.

## BASIS OF ALLEGATIONS

56.     Plaintiff has alleged the foregoing based upon the investigation of plaintiff's counsel, which included a review of SEC filings by Green Mountain, as well as regulatory filings and reports, securities analyst reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

57.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

58.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public regarding Green Mountain's business, operations, management and the intrinsic value of Green Mountain common stock; (b) enable defendants to artificially inflate the price of Green

29

Mountain shares; (c) enable Green Mountain to sell $250 million of Company shares to Lavazza, while defendants were in possession of material, adverse, non-public information about the Company; (d) enable Green Mountain insiders to sell millions of dollars of their privately held Green Mountain shares while in possession of material, adverse, non-public information about the Company; and, (e) cause plaintiff and other members of the Class to purchase Green Mountain common stock at artificially inflated prices.

59.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and, (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Green Mountain's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

60.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Green Mountain as specified herein.

61.     These defendants employed devices, schemes, and artifices to defraud, while in possession of material, adverse, non-public information.

62.     Defendants engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Green Mountain's value, performance, and continued substantial growth. This included the making of, or the participation in the making of, untrue

statements of material facts and omitting to state material facts necessary in order to make the statements made about Green Mountain and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein.

63.     Defendants engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Green Mountain common stock during the Class Period.

64.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (b) each of these defendants, by virtue of his/her responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports; (c) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and, (d) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

65.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly for the purpose and effect of concealing Green

31

Mountain's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations, and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by refraining from taking those steps necessary to discover whether those statements were false or misleading.

66. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Green Mountain common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of Green Mountain's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Green Mountain common stock during the Class Period at artificially high prices and were damaged thereby.

67. At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Green Mountain was experiencing, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Green Mountain

32

common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

68.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

69.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against Individual Defendants

70.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71.     The Individual Defendants acted as controlling persons of Green Mountain within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

72.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

73.    As set forth above, Green Mountain  and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.    Such other and further relief as the Court may deem just and proper.

34

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 30, 2010

DENNIS J. JOHNSON
EBEN F. DUVAL
**JOHNSON & PERKINSON**
P.O. Box 2305
1690 Williston Road
South Burlington, VT 05403
(802) 862-0030
(802) 862-0060 (fax)

KIM MILLER
**KAHN SWICK & FOTI, LLC**
500 Fifth Avenue, Ste. 1810
New York, NY 10110
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com

LEWIS KAHN
**KAHN SWICK & FOTI, LLC**
206 Covington Street
Madisonville, Louisiana 70447
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: lewis.kahn@ksfcounsel.com

**Attorneys for Plaintiff**

35