U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2011 FEB 23  AM 11: 46

BY _____
DEPUTY CLERK

# UNITED STATES DISTRICT COURT

## DISTRICT OF VERMONT

| | | |
|---|---|---|
| DAN M. HOROWITZ, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 2:10-cv-00227-wks **(Consolidated)** |
| Plaintiff, | ) ) ) | <u>CLASS ACTION</u> |
| vs. | ) ) | |
| GREEN MOUNTAIN COFFEE ROASTERS, INC., et al., | ) ) ) | |
| Defendants. | ) ) ) | |

**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS
OF FEDERAL SECURITIES LAWS**

Lead Plaintiffs Jerry Warchol, Robert M. and Jennifer M. Nichols, Marc Schmerler and Mike Shanley ("Plaintiffs" or "Lead Plaintiffs"), have alleged the following based upon the investigation of Plaintiffs' counsel, which included information obtained from confidential witnesses, including former Green Mountain Coffee Roasters, Inc. ("GMCR" or the "Company") and M.Block & Sons, Inc. ("MBlock") employees, a review of United States Securities and Exchange Commission ("SEC") filings by GMCR, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, and media reports, press releases and other public statements issued by or about the Company. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of purchasers of the common stock of GMCR between July 28, 2010 and September 28, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Defendant GMCR is engaged in the specialty coffee and coffee maker business, selling a variety of whole bean and ground coffee, cocoa, and teas under more than a dozen brand names. The Company's business is largely concentrated in the manufacture and marketing of gourmet single-cup coffee and tea brewing systems under the Keurig brand name. The Keurig brewing system consists primarily of K-Cups, or single-cup brewing packages, and K-Cup brewers and related accessories, which, during fiscal 2010, respectively accounted for approximately 62% and 24% of the Company's total revenue.

3.      This case concerns deceptive accounting and financial reporting practices at GMCR. As detailed further herein, GMCR has admitted to certain improper accounting practices, which are primarily associated with the Company's reporting of revenue, and has restated its previously issued financial statements. In addition, the Company has also reported that the SEC has an on-going "inquiry" into GMCR's revenue recognition practices, the outcome of which "could require the

filing of additional restatements of our prior financial statements." GMCR's accounting practices have also garnered attention from the financial press. For example, in a February 13, 2011 *Seeking Alpha* article entitled "Green Mountain Coffee:  Only Thing Brewing Is Trouble," author Jason Merriam, noted "[t]he accounting practices at Green Mountain Coffee Roasters (GMCR) are not baffling ... they are downright ludicrous." Similarly, on February 15, 2011, Sam Antar began his *Seeking Alpha* article, entitled "More Mucky Disclosures For Green Mountain Coffee Roasters," with the following sentence:  "Just about every time I examine financial reports issued by Green Mountain Coffee Roasters (NASDAQ: GMCR), I find new troubling accounting practices and financial disclosures."

4.     Prior to and during the Class Period, Defendants issued numerous statements and filed reports with the SEC regarding the Company's then-current financial performance and future earnings.  These statements were materially false and misleading because Defendants knew, but failed to disclose that: (i) the Company had improperly recorded revenue on shipments of product to its primary fulfillment vendor, MBlock; (ii) the Company improperly overstated its royalty income; (iii) the Company improperly understated customer incentive and marketing related expenses; (iv) the Company improperly accounted for inter-company transactions causing inventory and earnings to be overstated; (v) the Company publicly disseminated materially misstated financial statements that were presented in violation of Generally Accepted Accounting Principles ("GAAP"); and (vi) despite Defendants' attestations to the contrary, GMCR operated with material weaknesses in its system of internal control over financial reporting.

5.     On September 28, 2010, GMCR shocked the market by announcing both a cumulative $7.6 million overstatement of pre-tax income over a multi-year period (net of tax, the cumulative error resulted in a $4.4 million overstatement of net income or an overstatement of earnings per share by $0.03) and that the SEC's Division of Enforcement was conducting an

accounting inquiry into the Company's financial statements and had made a request for documents and information associated with the Company's revenue recognition practices and "one of" its fulfillment companies. In response to this announcement, the price of GMCR stock declined more than 16%, on almost ten (10) times the average trading volume.

6.      According to GMCR, it was informed of the SEC's inquiry eight days earlier, on September 20, 2010. Suspiciously, the very next day, September 21, 2010, GMCR executive officer Michelle Stacy ("Stacy"), President of the Company's Keurig division, exercised stock options that did not expire until 2018 and 2019, and sold 5,000 shares of GMCR stock at $37 a share.

7.      Approximately one month earlier, both Stacy and Scott McCreary ("McCreary"), the President of GMCR's other business division, the Specialty Coffee Business Unit ("SCBU"), unloaded a total of 230,000 Company shares for proceeds of more than $7.5 million. These sales, which also occurred shortly before the Company's official announcement of an SEC inquiry, were made after the SEC's initial contact with GMCR. Prior to these sales, there had not been significant insider trading activity since June 2009.

8.      As did the Company's division presidents, GMCR also engaged in a large stock sale just before the SEC inquiry became public. In August 2010, GMCR sold more than 8.5 million common shares to Italian coffee and coffee maker giant, Luigi Lavazza S.p.A. ("Lavazza") for $250 million. On September 14, 2010, GMCR announced it acquired all of the issued and outstanding shares of LJVH Holdings, Inc., its Canadian rival Van Houtte, for C$915 million.

9.      After the Class Period, on November 19, 2010, GMCR announced that investors "should no longer rely upon" the Company's previously issued financial statements for fiscal years 2007, 2008, 2009 and for the first three quarters of 2010.

10.     On December 9, 2010, GMCR issued a press release announcing its financial results for the fiscal fourth quarter and year ended September 25, 2010 and filed with the SEC its Form 10-

K for the year ended September 25, 2010 (the "2010 Form 10-K"). The 2010 Form 10-K included

GMCR's restated prior period financial statements and set forth the material weaknesses in the

Company's system of internal controls. The 2010 Form 10-K also revealed that GMCR's net

income for the thirty-nine weeks ended June 26, 2010 had been overstated by approximately 6.2%

and its accrued expenses at June 26, 2010 were understated by more than 5%.

## JURISDICTION AND VENUE

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

§1331 and Section 27 of the Exchange Act.

12.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the

Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC

[17 C.F.R. §240.10b-5].

13.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28

U.S.C. §1391(b). GMCR maintains its principle corporate offices in this District and many of the

acts charged herein, including the preparation and dissemination of materially false and misleading

information, occurred in substantial part in this District.

14.      In connection with the acts alleged in this Complaint, Defendants, directly or

indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

15.      Lead Plaintiffs, as set forth in their certifications previously filed with this Court and

incorporated by reference herein, purchased the common stock of GMCR during the Class Period

and have been damaged thereby.

16.      Defendant GMCR, formed in 1993 in the State of Delaware, maintains its corporate

headquarters at 33 Coffee Lane, Waterbury, Vermont 05676. The Company (together with its

subsidiaries) operates in the specialty coffee and coffee maker businesses. The Company's fiscal year ends on the last Saturday in September, with each fiscal year consisting of 52 weeks.

17. Defendant Robert P. Stiller ("Stiller") is, and was at all relevant times, the Founder and Chairman of the Board of Directors of GMCR.

18. Defendant Lawrence J. Blanford ("Blanford") is, and was at all relevant times, the President, Chief Executive Officer and a Director of GMCR.

19. Defendant Frances G. Rathke ("Rathke") is, and was at all relevant times, the Chief Financial Officer, Treasurer, Secretary, and Principal Financial and Accounting Officer of GMCR.

20. Defendants Stiller, Blanford and Rathke are referred to herein as the "Individual Defendants."

21. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of GMCR, were privy to confidential and proprietary information concerning GMCR, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning GMCR, as discussed in detail below. Because of their positions with GMCR, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

22. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive

officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of GMCR's business.

23.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

24.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ Global Market ("NASDAQ") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to GMCR's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of GMCR common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

25.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of GMCR common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.

The scheme: (i) deceived the investing public regarding GMCR's business, operations and management and the intrinsic value of GMCR common stock; (ii) enabled the Company to procure debt financing on favorable terms to fund a major acquisition; (iii) allowed GMCR to sell 8,566,649 common shares in a private transaction at artificially inflated prices; (iv) allowed insiders to sell 240,000 GMCR shares at artificially inflated prices; and (v) caused Plaintiffs and members of the Class to purchase GMCR common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

26.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of GMCR between July 28, 2010 and September 28, 2010, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

27.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, GMCR common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by GMCR or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

28.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

29.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

30.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of GMCR;

(c)     whether the prices of GMCR common stock were artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

31.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

32.     Defendant GMCR describes itself as a leader in the specialty coffee and coffee maker businesses and markets over 200 whole bean and ground coffee selections, cocoa, teas and coffees in K-Cup portion packs, Keurig single-cup brewers and other accessories.  The Company manages its operations through two business segments, the SCBU and the Keurig business unit.

- 8 -

33.     SCBU sources, produces and sells coffee, cocoa, teas and other beverages in K-Cup portion packs and coffee in more traditional packaging. These varieties are sold primarily to wholesale channels, including supermarkets and convenience stores, restaurants and hospitality, and to office coffee distributors and directly to consumers.

34.     Keurig sells single-cup brewers, accessories and coffee, tea, cocoa and other beverages in K-Cup portion packs produced by SCBU and other licensed roasters to consumers for home use (referred to by the Company and herein as the "AH" market) principally via retailers, who principally process their sales orders through fulfillment entities. Keurig also sells single-cup brewers and K-Cup portion packs for non-home use (referred to by the Company and herein as the "AFH" market).

35.     In recent years, the significant driver of the Company's growth has been the sale of K-Cups and Keurig brewing systems. While the Company claims to sell its products to customers in North America, a substantial of its business is done in the U.S., with approximately 97% of its fiscal 2010 revenues being made to U.S. customers.

36.     GMCR utilizes a "razor/razor blade" type business model, whereby it sells brewers at or below cost to help increase the brewers installed base so that it can generate a recurring stream of high-margin future revenues on K-Cup sales. During the past few years, GMCR has been able to increase its K-Cup market share, in part, by acquiring virtually all of the coffee companies ("roasters") that competed in the K-Cup market space.

37.     While GMCR has been able to establish a market leading position, the patent to the Company's single-cup brewing system technology is set to expire in 2012. With larger, high resourced competitors looming, such as Nestle, Kraft Foods and Starbucks, and ready to enter the market when the Company's patent expires, GMCR's survival is largely dependant upon its current ability to rapidly grow and secure brand loyalty with consumers.

## GMCR's Deceptive Financial Reporting

38.     Prior to and during the Class Period, Defendants represented that GMCR's financial statements were presented in conformity with GAAP and that the Company maintained a sound system of internal controls over its financial reporting.

39.     Defendants have now admitted that such representations were materially false and misleading and that investors "should no longer rely upon" GMCR's previously issued financial statements for fiscal years 2006, 2007, 2008, 2009 and the first three quarters of 2010 given that such financial statements were materially misstated. Defendants have also admitted that material weaknesses exist in the Company's system of internal controls over its financial reporting.

### The SEC's Financial Reporting Inquiry, GMCR's Admitted Violations of GAAP and Financial Restatements

40.     On September 28, 2010, GMCR filed with the SEC a Form 8-K (the "September 28, 2010 Form 8-K") disclosing that, on September 20, 2010, the staff of the SEC's Division of Enforcement informed the Company that it was conducting an inquiry and made a request for a voluntary production of documents and information.

41.     In addition to this disclosure, the September 28, 2010 Form 8-K noted that the Company's management discovered an "immaterial" error related to the accounting of inter-company K-Cup inventory. This error resulted in the overstatement of reported inventory and income and the understatement of expense prior to and during the Class Period.

42.     Approximately a month and a half later, GMCR's "immaterial" accounting error coalesced into the restatement of all of the Company's published financial statements over a more than four year period. On November 19, 2010, GMCR issued a press release (the "November 19, 2010 press release") announcing that investors "should no longer rely upon" the Company's previously issued financial statements for fiscal years 2007, 2008, 2009 and the first three quarters of 2010.

43.    In reaching this determination, Defendants have admitted that such financial statements were materially misstated at the time they were issued because GAAP provides that only previously issued financial statements that are materially misstated need to be retroactively restated. *See, e.g.*, Accounting Standards Codification 250.

44.    Moreover, as SEC's Staff Accounting Bulletin No. 99 points out "qualitative factors may cause misstatements of quantitatively small amounts to be material" and that "the staff believes that a registrant and the auditors of its financial statements should not assume that *even small quantitative misstatements in financial statements associated with the following are immaterial*:"[1]

- misstatements that mask a change in earnings or trends;
- misstatements that mask a failure to meet analysts' expectations; or
- misstatements concerning a portion of the registrant's business that has been identified as playing a significant role in the registrant's operations.

45.    On December 9, 2010, the Company filed the 2010 Form 10-K with the SEC, which included GMCR's restated prior period financial statements and identified material weaknesses in the Company's system of internal controls. The Company's restated financial statements reveal that GMCR's undistributed earnings from its inception through June 26, 2010 had been overstated by more than 3%. The Company's restated financial statements also reveal that GMCR's net income for the thirty-nine weeks ended June 26, 2010 had been overstated by approximately 6.2% and its accrued expenses at June 26, 2010 were understated by more than 5%.

46.    Prior to and during the Class Period, Defendants represented that the Company's financial statements were presented in conformity with GAAP.  These representations were materially false and misleading when made because Defendants, in violation of GAAP, knowingly

---

[1]    Unless indicated otherwise herein, all emphasis is added.

or recklessly employed improper accounting practices that materially overstated GMCR's reported net income during the Class Period.

47.     Indeed, compliance with GAAP is a basic fundamental obligation of publicly traded companies. As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. §210.4-01(a)(1).

48.     Defendants have now admitted that: (i) investors "should no longer rely upon" the Company's financial statements for fiscal years 2006, 2007, 2008, 2009 and the first three quarters of 2010 given that they were materially misstated; and (ii) that material weakness exist in the Company's system of internal controls over its financial reporting.[2]

49.     In the 2010 Form 10-K, Defendants classified the Company's violations of GAAP and misstatements in GMCR's prior financial statements as being associated with errors in the accounting and reporting of:

(a)     royalty income on intercompany transactions that were not eliminated from the Company's consolidated financial statements, which resulted in the overstatement of reported inventory and earnings and the understatement of reported cost of sales;

(b)     royalty income that was improperly recognized when Keurig purchased K-Cup inventory from third-party roasters, which resulted in the overstatement of reported inventory, sales and earnings;

---

[2]     Although the November 19, 2010 press release announced that investors should no longer rely upon the Company's financial statements for fiscal years 2007, 2008, 2009 and the first three quarters of 2010, the 2010 Form 10-K added the Company's fiscal 2006 financial statements to the list of GMCR's previously issued misstated financials.

(c)     customer incentive and marketing expenses that were not recorded, which resulted in the understatement of reported liabilities and expense and the overstatement of income; and

(d)     other adjustments that GMCR previously deemed to be immaterial and went unrecorded.

50.     As a result of the foregoing violations of GAAP, during the Class Period GMCR's reported net income for the thirty-nine weeks ended June 26, 2010 were overstated by approximately 6.2%.

51.     Indeed, GMCR's manipulation of product royalty income demonstrates Defendants' financial slight of hand.  Prior to the beginning of the Class Period, GMCR and several coffee roasters and tea packers entered into licensing arrangements, whereby GMCR granted such licensees the right to manufacture, distribute and sell K-Cups on an exclusive or non-exclusive basis in exchange for royalty payments.[3]

52.     In its Form 10-K for the year ended September 26, 2009 (the "2009 Form 10-K"), the following was disclosed as the Company policy of accounting for royalty income:

> Royalty revenue is recognized *upon shipment of K-Cups by roasters* as set forth under the terms and conditions of various licensing agreements.

53.     Accordingly, during the Class Period, GMCR earned royalty income whenever licensed third-party roasters shipped K-Cups to their customers.  Although not disclosed in the 2009 Form 10-K, prior to and during the Class Period, GMCR *purchased* K-Cup inventory from its licensed vendors for resale by Keurig.  Since GMCR's accounting policy, albeit improperly, allowed the Company to recognize royalty income at the time third-party roasters shipped K-Cups to GMCR, Defendants were able to, and did, manage the Company's reported earnings by causing GMCR to

---

[3]     Certain of these licensed coffee roasters have now been acquired by GMCR.

recognize royalty income on an as needed basis by simply ordering K-Cups from licensed third-party roasters and warehousing such inventory at its or MBlock's facilities.

54.    As illustrated in the following chart, on GMCR's July 28, 2010 conference call, Defendant Blanford indicated GMCR was rapidly ramping up its inventories "as we get into the fall season with the expectation that we are going to continue to exceed our own expectations on brewer sales:"



55.    However, the Company's projected year-over-year sales guidance for the September 2010 quarter continued the trend of decelerating sales growth that the Company experienced in the June 2010 quarter:



56.     Accordingly, Defendants' reasoning for the Company's then-current increase in inventory was contradicted by their own guidance for GMCR's sales, while GMCR's policy of accounting for royalty income coupled with the Company's practice of purchasing of K-Cups from licensed roasters afforded Defendants a means of managing the Company's earnings during the Class Period.

57.     Prior to and during the Class Period, GMCR's royalty income had been a significant element of the Company's profitability. As disclosed in the 2009 Form 10-K "[a] significant and increasing percentage of our total revenue has been attributable to royalties and other revenue from sales of K-Cups for use with our Keurig single-cup brewing systems." In fact, $39.5 million, or approximately 44%, of GMCR's 2009 pre-tax income of $90.4 million, as reported in the 2009 Form 10-K, was derived from third-party royalty income.

58.     Then, GMCR, as part of the Company's financial restatement, revealed in the 2010 Form 10-K that it purchased K-Cups from licensed third-party roasters for resale by Keurig and that it had changed its policy of accounting for royalty income on such purchases:

> Roasters licensed by Keurig to manufacture and sell K-Cup portion packs, ***both to Keurig for resale and to their other coffee customers***, are obligated to pay a royalty to Keurig upon shipment to their customer. Keurig records royalty revenue upon

shipment of K-Cup portion packs by licensed roasters to third-party customers as set forth under the terms and conditions of various licensing agreements. *For shipments of K-Cup portion packs to Keurig for resale, this royalty payment is recorded as a reduction to the carrying value of the related K-Cup portion packs in inventory*.

\* \* \*

Keurig earns royalty income from KCup portion packs when shipped by its licensed roasters, *except for shipments of K-Cup portion packs by third party roasters to Keurig, for which the royalty is recognized as a reduction to the carrying cost of the inventory and as a reduction to cost of sales when sold through to third parties by Keurig*.

59.   Although the quantitative materially associated with Keurig's manipulation of royalty income was reported in GMCR's restated financial statements, the magnitude of such manipulation in GMCR's Class Period financial statements is muted by the fact that, prior to the beginning of the Class Period, GMCR acquired certain third-party roasters from whom Keurig purchased K-Cups. Accordingly, the Company's 2010 Form 10-K revealed that GMCR's acquisitions will result in the diminution of royalty income on a going forward basis:

> Due to the Company's completed and pending acquisitions of third party licensed roasters, these purchases and the associated royalties [*i.e.*, K-Cups purchased from licensed resellers by Keurig for resale] had less impact, since the post-acquisition royalties from these wholly-owned roasters are eliminated in the Company's consolidated financial statements.

\* \* \*

> As a result of the acquisitions discussed above [of previously third-party roasters], the Company believes that royalty revenue will decrease materially in the future.

**The SEC Inquiry**

60.   As noted above, on September 28, 2010, GMCR filed the September 28, 2010 Form 8-K with the SEC, which stated, in pertinent part:

> On September 20, 2010, the staff of the SEC's Division of Enforcement informed the Company that it was conducting an inquiry and made a request for a voluntary production of documents and information.  Based on the request, the Company believes the focus of *the inquiry concerns certain revenue recognition practices* and the Company's relationship with *one* of its fulfillment vendors. The Company, at the direction of the audit committee of the Company's board of directors, is cooperating fully with the SEC staff's inquiry.

- 16 -

61.     Analysts that follow GMCR have stated that the fulfillment vendor referred to in the September 28, 2010 Form 8-K is MBlock.  In addition, in the 2010 Form 10-K, GMCR discloses that "Keurig relies on a *single* order fulfillment entity, M.Block & Sons ("MBlock"), to process the majority of sales orders for its AH single-cup business with retailers in the *United States*."  The 2010 Form 10-K also reveals that U.S. customers were responsible for approximately 97% of the Company's fiscal 2010 revenues.

62.     Based on information and belief, Lead Plaintiffs allege herein that the single fulfillment company referred to in the September 28, 2010 Form 8-K is MBlock.

65.     Upon issuing its restated financial statements from 2006 through and including 2010, GMCR represented that "none of the financial statement errors are related to the Company's relationship with M.Block & Sons, Inc."  Consequently, should the SEC inquiry identify additional revenue recognition violations, further restatements of the Company's financial statements may be required.

63.     According to its web-site, MBlock provides end-to-end supply chain solutions in warehousing, distribution, logistics, sales and marketing, IT, customer service and finance for manufacturers and retailers operating in traditional commerce channels.  MBlock's web-site also indicates that it became Keurig's U.S. distributor in 2003.

64.     Information provided by former GMCR and MBlock employees described the companies' relationship as one where GMCR dictated their business dealings and being something other than on an arms-length basis:

65.     For example, a former GMCR distribution planning manager, employed with the Company from 2009 through March 2010 (Confidential Witness "CW" No. 1, or CW1), indicated that:

(a)     Prior to mid-2009, GMCR had made a significant investment in MBlock, specifically to support its infrastructure. (In fact, MBlock opened its third distribution center in 2009 and its fourth in 2010.);

(b)     GMCR Vice President of Operations Jonathan Wettstein and Director of Operations Don Holly did not set production levels based upon prior ordering history or inventory levels. Instead, to give the illusion of continued growth to shareholders, they knowingly caused the Company to overproduce products. Thereafter, CW1 believed that GMCR directed MBlock to hold more product than it could immediately ship and that, due to overstocking at MBlock, product had to be destroyed when it remained in the warehouse past its expiration date. (CW2, described below, confirmed that product stored in warehouses would remain so long as to go past its expiration date.);

(c)     Because GMCR, in essence, controlled the warehousing process and MBlock did not immediately pay for the products it bought, CW1 believed that revenue was improperly recorded on "sales" to MBlock; and

(d)     CW1 further indicated that MBlock used rudimentary spreadsheets to track orders and delivery and that its poor tracking systems allowed GMCR to bury inventory, controlling the process and shuffling items into and out of MBlock's warehouses.

66.     A former regional sales manager for GMCR from late 2008 until late 2010 ("CW2") stated that anyone at the Company would acknowledge that MBlock was, in essence, a captive company and would do as GMCR instructed. CW2 indicated that his/her current employer is careful in its dealings with MBlock because it is aware of the close relationship between GMCR and MBlock.

67.     A former employee of MBlock from 2001 through early 2009 ("CW3") indicated that, in addition to taking orders, MBlock also had as much as 500,000 square feet of warehouse space, storing both brewers and coffee. Prior to mid-2009, GMCR represented 20% of MBlock's

business. However, after a new contract was entered into, around July 2009, GMCR's business shot up to approximately 75% of MBlock's total business.

68.     Moreover, although the September 28, 2010 Form 8-K indicates that, "[o]n **September 20, 2010**, the staff of the SEC's Division of Enforcement informed the Company that it was conducting an inquiry and made a request for a voluntary production of documents and information," the above-noted former employee has stated that by no later than the first week of May 2010, he/she was contacted by Company employees who asked if he/she had been had been the whistleblower in an SEC investigation of GMCR.

69.     Accordingly, Company employees contacted the confidential witness concerning an SEC investigation **five months** prior to the issuance of the September 28, 2010 Form 8-K, which disclosed that the SEC informed the Company that it was conducting an inquiry and made a request for a voluntary production of documents and information on **September 20, 2010**.

**GMCR Improperly Recognizes Revenue on Product Shipments to MBlock**

70.     CW1 indicated that GMCR improperly recognized revenue on 150 truck loads of product that was shipped to MBlock during the quarter ended December 26, 2009. This former GMCR manager stated that he/she and other Company employees, including the Company's global transportation manager, were unable to locate the requisite paperwork, including purchase orders, material requisition orders, or product shipment authorizations, traditionally used by GMCR to validate the sale.

71.     Specifically, CW1 indicated that because there was no order for those products, no payment was ever made on the 150-truckload shipment. In addition, the order was not listed on the Company's production forecast schedule and employees who worked under CW1 not only saw the trucks go out, but visited MBlock and saw its warehouses filled to the rafters with K-Cups. CW1, who estimated that the value the revenue recognized on the foregoing improperly recorded

transaction to be between $7.5 and $15 million dollars, indicated the following GMCR executives were aware of the shipment: Vice President of Operations Jonathan Wettstein (who regularly provided updates to CEO Blanford), SBCU President McCreary and Vice President of Finance Tina Bissonette.

72.     As a result of the foregoing, GMCR violated GAAP's criteria of revenue recognition, which provides that the conditions for revenue recognition ordinarily are met when the seller's price to the buyer is substantially fixed or determinable at the date of sale; the buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product; the buyer's obligation to the seller is not changed in the event of theft or physical destruction of the product; the buyer has economic substance apart from the seller; the seller does not have significant future performance obligations to the buyer; and the amount of future returns, if any, can be reasonably estimated. *See, e.g.,* Accounting Standards Codification 605.

73.     Consequently, GMCR violated its revenue recognition policy, as disclosed in the 2010 Form 10-K, when it prematurely recorded revenue on shipments of product to MBlock:

> The Company recognizes revenue when the fulfillment entities ship the product based on the contractual shipping terms, which generally are upon product shipment, and when all other revenue recognition criteria are met.

74.     CW1 also indicated that GMCR had earlier changed the wording of its revenue recognition policy because the auditors had found discrepancies and senior management was thus aware that GMCR was accounting for revenue incorrectly.

75.     In addition, a former regional sales director for Keurig between 2004 and the fall of 2010 ("CW5"), indicated that distributors were unhappy with certain sales made to them by MBlock and that during a March 2010 sales conference call with regional directors, Keurig Vice Presidents Chris Stevens, Dan Cignarella and Dave Manly denied sales to distributors had been made by MBlock.

76.     A former Vice President of Operations for GMCR during 2010 ("CW6"), stated that

while the accounting department in Vermont told CW6 to book shipments to MBlock as a sale, the

SEC questioned the existence of an arms-length relationship between GMCR and MBlock.  In fact,

CW6 did not know if MBlock ever owned the products shipped to it.

### Materially False and Misleading Statements
### Issued During the Class Period

77.     The Class Period begins on July 28, 2010.  On that date, GMCR issued a press release

announcing its financial results for the fiscal 2010 third quarter, the thirteen and thirty-nine week

periods ended June 26, 2010.  The press release announced "Continued Strong Sales and Earnings

Growth for Fiscal 2010 Third Quarter," with net sales for the quarter increasing 64% to $311.5

million as compared to $190.5 million reported in the third quarter of fiscal 2009.  The press release

also stated:

> According to Generally Accepted Accounting Principles ("GAAP"), net income for
> the third quarter of fiscal 2010 totaled $18.6 million, or $0.13 per fully diluted share.

*     *     *

**Key Business Drivers & Metrics**

•       The two primary drivers of the $121.0 million, or 64%, increase in the
Company's net sales were increases in total K-Cup portion pack net sales and Keurig
brewer and accessory sales.

> o       Approximately 86% of consolidated net sales in the third quarter was
> from the Keurig brewing system and its recurring K-Cup portion pack
> revenue.

> o       Net sales from K-Cup portion packs totaled $197 million in the
> quarter, up 90%, or $93.1 million, over 2009.

> o       Net sales from Keurig brewers and accessories totaled $64 million in
> the quarter, up 69%, or 26.2 million, from the prior year period.

•       For the Keurig business unit, net sales for the third quarter of fiscal 2010,
after the elimination of inter-company sales, were $157.2 million, up 74% from net
sales of $90.1 million in the third quarter of fiscal 2009.

- For the Specialty Coffee business unit (SCBU), net sales for the third quarter of fiscal 2010, after the elimination of intercompany sales, were $154.3 million, up 54% from net sales of $100.4 million in the third quarter of fiscal 2009.

**Costs, Margins and Income**

- Third quarter 2010 gross profit increased to 35.2% of total net sales compared to 33.6% for the corresponding quarter in 2009. This was as a result of higher manufacturing gross margin derived from the increase in volume of the Company's manufactured K-Cups as a percentage of total system volume.

- During the third quarter, the Company experienced continued higher levels of warranty expense and sales returns related to a quality issue associated with certain brewer models produced primarily in late calendar 2009. As previously disclosed, the Company implemented hardware and software changes which it believes has corrected the issue. The Company reached agreement with its suppliers and will recover approximately $6 million as reimbursement related to this issue. This recovery was reflected in the third quarter cost of sales as a reduction to warranty expense and substantially offsets the higher warranty expense and sales returns costs incurred in the fiscal third quarter.

- Selling, general and administrative expenses as a percentage of net sales for the third quarter were 23.0% as compared to 21.7% in the prior year. Third quarter 2010 general and administrative expenses include $4.0 million related to the Diedrich acquisition as well as the amortization of identifiable intangibles of $4.3 million due to the Company's prior acquisitions as compared to $1.5 million in the prior year third quarter.

- The Company increased its GAAP operating income by 68%, to $38.2 million, in the third quarter of fiscal 2010, as compared to $22.8 million in the year ago quarter, and improved its GAAP operating margin to 12.3% from 12.0% in the prior year period. Excluding the impact of the $4.0 million transaction-related expenses in the third quarter of fiscal 2010, the Company's non-GAAP operating income was up 85% to $42.2 million and represented 13.5% of sales compared to $22.8 million, or 12.0% of sales in the prior year.

- Interest expense was $1.5 million in the third quarter of fiscal 2010, compared to $1.1 million in the prior year quarter.

- Income before taxes for the third quarter of fiscal 2010 increased 70% to $36.7 million as compared to $21.7 million in the third quarter of fiscal 2009.

- The Company's tax rate for the fiscal third quarter was 49.5% as compared to 34.7% in the prior year quarter reflecting the tax effect of the recognition of the estimated total $12 million non-deductible acquisition-related expenses incurred during the Company's first, second and third quarters of fiscal 2010 for the Diedrich acquisition which closed during the Company's fiscal third quarter.

Defendant Blanford commented on the results, stating, in part:

- 22 -

In our fiscal third quarter, through the strong efforts of all our employees, we delivered excellent results on our key financial performance metrics including revenue, gross margin, operating margin and net income. We have now achieved 11 consecutive quarters of better than 40 percent net sales growth. For the first nine months of fiscal 2010 we have produced net sales growth of 70% and non-GAAP earnings per share growth of 89% over the same period for fiscal year 2009.

Continued execution of our strategic business initiatives, including most recently, our acquisition of Diedrich, is driving GMCR's growth and enabling us to advance adoption and awareness of our growing portfolio of compelling brands. We believe the inherent strength of our business model, combined with our passionate employees, the strong support of our business partners and our fervent belief that we can transform the way the world views business are key drivers behind our growth and success.

The coming holiday buying season is shaping up to be another exciting opportunity for us to help more consumers discover and enjoy outstanding beverages with the convenience and choice of the Keurig Single-Cup brewing system. We are looking for a strong kickoff to our fiscal year 2011 and are providing our initial fiscal year 2011 estimate for sales growth in a range of between 44% to 50% and earnings per share of $1.15 to $1.20.

Defendants also disseminated the following slide associated with GMCR's 2009 third quarter

results:



78.     Following the issuance of the press release, GMCR held a conference call with

analysts and investors to discuss the Company's earnings and operations. On the conference call,

Defendants made numerous positive statements about the Company's business, operations and

prospects, with GMCR's executive management touting the Company's sales growth, multi-channel distribution model and the consistency in the shipments to the Company's distributors and in rate of sale. The following exchanges took place:

Defendant Blanford:

*Our third quarter net sales of $311.5 million represent year-over-year growth of 64%.* We continue to drive strong net income growth generating non-GAAP improvement of 82%. Non-GAAP EPS increased 58% to $0.19 per share in the third quarter from a comparable $0.12 per share in last year's third quarter. Our fiscal third quarter results do include Diedrich's financials for a portion of the quarter as we closed our acquisition of Diedrich Coffee on May 11th, 2010. Integration into our specialty coffee business unit is going well as Scott will talk to in more detail in his remarks.

*Success of the Keurig Single-Cup continues to drive our growth with system related revenue accounting for 86% of our total revenue for the third quarter. During the quarter there were shipments of 683 million K-Cup portion packs system wide representing an increase of 72% over the same period last year.* There also were 846,000 brewers shipped system wide with Keurig branded brewing technology including brewers shipped from our licensed partners Bravo and Cuisinart. This compares to 444,000 breweries shipped system wide during the third quarter of fiscal 2009.

\*　　　\*　　　\*

Defendant Rathke:

In Q3 sales of the Keurig Single-Cup system to retailers, super market, Consumer Direct and to the office coffee channels continue to drive GMCR's strong sales growth. As Larry noted, *Keurig Single-Cup related sales represented 86% of our total $311.5 million in sales for the third quarter in a row.* Net sales related to the Timothy's brand which are included in the company's results since its acquisition in November of 2009 represented approximately 8 percentage points of the 64% increase in GMCR's total consolidated sales. Also, net sales related to the Diedrich brand which are included in the Company's results since its acquisition on May 11 2010 represented approximately 4 percentage points of the 64% increase in GMCR's total consolidated sales. Our gross margin was up 160 basis points over last year to 35.2%.

This improvement reflected higher manufacturing gross margins as a result of the Timothy's and Diedrich's acquisitions which drove an increase in our manufactured K-Cups as a % of total system volume. During the third quarter we experienced continued higher levels of warranty expense and sales returns related to a quality issue associated with certain brewer models produced primarily in late calendar 2009. As previously disclosed we implemented hardware and software changes which we believe have corrected the issue. We reached agreement with our suppliers

and will recover approximately $6 million as reimbursement related to this issue. This recovery was reflected in the third quarter cost of sales as a reduction to warranty expense and offset a substantial amount of the higher warranty expenses and sales returns incurred in the third quarter.

*       *       *

<u>Michelle Stacy</u> - *President, Keurig Segment*:

For the current business unit net sales for the second quarter were $157.2 million, up 74% from the net sales of $90.1 million in the same period last year. *We saw very strong brewer shipments in the quarter with 846,000 Keurig system brewers sold*. As of last quarter we had begun to report a system wide brewer number which includes brewers marketed and shipped by our licensed partner brand, Revel, Cuisinart, and going forward Mr. Coffee. In our fiscal third quarter Keurig brand brewers continued to represent the vast majority of the total system wide brewers and we will remain the driving brand behind the current system.

*       *       *

<u>Scott McCreary</u> - *Chief Operating Officer, GMCR*:

The specialty coffee business units delivered another fantastic quarter as we continue to drive Keurig Single-Cup brewer and K-Cup portion pack innovation and adoption. Increasing our total sales to $154 million, up 54% over the same period last year. *Our multichannel distribution model continues to drive momentum across all our channels and we're seeing particularly strong growth within in home and retail sellers*.

*       *       *

<u>Mitch Pinheiro</u> - *Janney Montgomery Scott, Analyst*:

Hello there. One question is tough so it'll be one topic here. Can you estimate the impact on refilling store level inventory on the brewers side in this quarter? Is there any estimate for that? And then related to that is there any impact on K-Cups on the channel fill through the new distribution at grocery?

<u>John Whoriskey</u> - *Keurig, General Manager*:

Hi Mitch, this is John Whoriskey, I'll handle the first part of that question. Yes, we would estimate the impact to be roughly 75,000 units, which is really just kind of a catch up from the very strong sales that we had over the holiday season and now we're really back to building our inventory levels at retail to where they need to be. So with that I'll turn the question over to Jim Travis.

<u>TJ Whalen</u> - *GMCR, VP of Marketing*:

Hi, Mitch. This is TJ. In relation to grocery, *we've been reporting fairly consistent gains in both distribution and rate of sale and so we don't see anything out of the*

*ordinary or kind of off trajectory in terms of either of those factors.* We continue to build grocery distribution and we continue to see sales accelerate above and beyond that.

79.     In response to the Company's announcement and Defendants' statements on the conference call, the price of GMCR stock rose $2.69 per share on July 29, 2010, or more than 9%, to close at $31.36 per share.

80.     On August 5, 2010, GMCR filed with the SEC its Form 10-Q for the thirteen weeks ended June 26, 2010 (the "2010 Q3 Form 10-Q"), which was signed by Defendants Blanford and Rathke. The 2010 Q3 Form 10-Q included GMCR's financial statements for the thirteen and thirty-nine weeks ended June 26, 2010, which were represented to have been presented in conformity with GAAP. In this regard, the 2010 Q3 Form 10-Q stated:

> The accompanying unaudited consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information, the instructions to Form 10-Q, and Rule 10-01 of Regulation S-X. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete consolidated financial statements.
>
> In the opinion of management, all adjustments considered necessary for a fair presentation of the interim financial data have been included. Results from operations for the thirteen and thirty-nine week periods ended June 26, 2010 are not necessarily indicative of the results that may be expected for the fiscal year ending September 25, 2010.

In addition, the 2010 Q3 Form 10-Q included the following materially false and misleading representations about GMCR's disclosure and internal controls:

> As of June 26, 2010, the Company's management with the participation of its Chief Executive Officer and Chief Financial Officer conducted an evaluation of the effectiveness of the design and operation of the Company's disclosure controls and procedures pursuant to Rule 13a-15 and 15d-15 under the Securities Exchange Act of 1934 (the "Exchange Act"). Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures (as defined in Rule 13a-15 of the Exchange Act) are effective.
>
> There have been no changes in the Company's internal control over financial reporting during the most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

81.     Defendants have now admitted that the above representations were materially false and misleading, that "material weaknesses" in GMCR's internal controls existed during the Class Period and that the Company's disclosure controls and procedures were "not effective" during the Class Period.  One of the material weaknesses now identified is associated with the "financial statement consolidation process."  Specifically, according to the 2010 Form 10-K:

> The company did not have effective controls to ensure the completeness and accuracy of the accounting for intercompany transactions in its financial statement consolidation process.  The method used to identify all intercompany transactions between the business segments for purposes of performing required eliminations, and to process and to document the eliminations, was not accurately designed and adequately performed during each reporting period.

82.     Several former Company employees commented that relationship between GMCR's two business divisions likely caused or contributed to the problem:

(a)     A former director of operations, employed by GMCR from late 2008 until September 2010 ("CW7"), indicated that the two business divisions maintained separate accounting departments;

(b)     A consultant who worked for GMCR in the summer of 2009 ("CW8") indicated that GMCR's accounting system used Peoplesoft software and Keurig's accounting system used Great Plains software;

(c)     A territory manager for GMCR from 2004 until late 2010 ("CW9") indicated that Keurig maintained its own accounting department and operated somewhat separately from GMCR; and

(d)     An accounting manager who worked for a roaster acquired by GMCR ("CW10") indicated that GMCR used Peoplesoft accounting software, but that the Keurig division used Great Plains software and maintained its own accounting team.  CW10 commented that problems with intercompany transfers could arise because of the fact that the two divisions used different systems.

- 27 -

83.     As a result of the foregoing, Defendant Blanford's and Rathke's certifications of

GMCR's internal and disclosure controls, which were included in the 2010 Q3 Form 10-Q, were also

materially false and misleading:

I, [Defendants Blanford and Rathke], certify that:

1.     I have reviewed this quarterly report on Form 10-Q of Green Mountain
Coffee Roasters, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of
a material fact or omit to state a material fact necessary to make the statements made,
in light of the circumstances under which such statements were made, not misleading
with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial
information included in this report, fairly present in all material respects the financial
condition, results of operations and cash flows of the registrant as of, and for, the
periods presented in this report;

4.     The registrant's other certifying officer(s) and I are responsible for
establishing and maintaining disclosure controls and procedures (as defined in
Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial
reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the
registrant and have:

     a.     Designed such disclosure controls and procedures, or caused such
     disclosure controls and procedures to be designed under our supervision, to
     ensure that material information relating to the registrant, including its
     consolidated subsidiaries, is made known to us by others within those
     entities, particularly during the period in which this report is being prepared;

     b.     Designed such internal control over financial reporting, or caused
     such internal control over financial reporting to be designed under our
     supervision, to provide reasonable assurance regarding the reliability of
     financial reporting and the preparation of financial statements for external
     purposes in accordance with generally accepted accounting principles;

     c.     Evaluated the effectiveness of the registrant's disclosure controls and
     procedures and presented in this report our conclusions about the
     effectiveness of the disclosure controls and procedures, as of the end of the
     period covered by this report based on such evaluation; and

     d.     Disclosed in this report any change in the registrant's internal control
     over financial reporting that occurred during the registrant's most recent
     fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual
     report) that has materially affected, or is reasonably likely to materially
     affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

84.    On August 10, 2010, GMCR and Lavazza announced that the companies entered into a $250 million common stock purchase agreement. Under the terms of the agreement, Lavazza agreed to purchase $250 million of newly issued GMCR common shares, or approximately 7% of GMCR's then-outstanding common stock, at a price per share equal to 92.5% of the 60 day volume weighted average closing price of GMCR stock. At the end of the Class Period, GMCR announced that it issued 8,566,649 common shares in connection with the transaction. In connection with the transaction, GMCR made representations and warranties concerning the accuracy of its SEC filings since September 29, 2009, and the adequacy of its internal controls over financial reporting.

85.    On August 11, 2010, GMCR presented at the Canaccord Adams Global Growth Conference. During the conference, Defendant Blanford made numerous positive statements about the Company's business, operations and prospects, and touted the Company's EPS growth. For example:

So for business performance. I will just touch on these because the data from our third quarter is readily available. But we have certainly been growing our top line in a very robust manner. If you look over the last three years, 2008, 2009 and 2010, 2010 being estimated we have got one quarter left. We will have grown the top line just under 60%. And for this fiscal year we are actually projecting to come in a little higher than the three-year compound average growth rate in the 66% to 68%, and we have driven 70% in the top line year-to-date.

Next. EPS growth. Non-GAAP. And only difference really being the deduction of expenses due to one-time acquisition charges, have over that same time period, 2008 to 2010, estimated been growing faster than sales growth at nearly 80%, and for this

fiscal year we are projecting to end up a bit above that, 82% to 87%, and we are 89% year-to-date.

Next. And as we have been growing the top line and the bottom line and making investments in both organic growth and some acquisitions that I will reference later, we have done so with a very strong focus of investing behind our strategy, and being able to generate return on invested capital and return on equity that exceeds the Russell 1000 in both cases. So very good stewards of money.

In connection with its appearance at the conference, GMCR disseminated the following slide to analysts and investors:



86.     On August 19, 2010, GMCR issued a press release announcing that it ranked number two overall on *Fortune's* annual list of the 100 Fastest-Growing Companies. The press release also noted that GMCR was the highest-ranked consumer package goods company on the list, which includes profitable, publicly-held companies with at least $50 million in annual revenue, and that "[l]ast month, GMCR reported its 11th consecutive quarter of better than 40 percent net sales growth. For the first nine months of fiscal 2010, the [C]ompany has produced net sales growth of

70% over the prior year and excluding acquisition-related expenses, earnings per share growth of 89% over the same period for fiscal year 2009."

87.     On September 14, 2010, GMCR announced that it had executed a share purchase agreement pursuant to which GMCR agreed to acquire all the outstanding shares of LJVH Holdings, Inc., a leading gourmet coffee Canadian brand, from an affiliate of Littlejohn & Co., LLC, a private equity firm headquartered in Greenwich, Connecticut, for a cash purchase price of C $915 million or $890 million based on the exchange rate as of September 13, 2010. The press release also stated that GMCR intended to finance the acquisition, which was subject to regulatory approval and is expected to close by the end of calendar year 2010, through a combination of cash on hand and $1.35 billion of new debt financing comprised of: (i) a $750 million five-year senior secured revolving credit facility; (ii) a $250 million five-year senior secured term loan A facility; and (iii) a $350 million six-year senior secured term loan B facility.

88.     GMCR disclosed that the credit facilities will be utilized to finance the above acquisition and transaction expenses, as well as to refinance the Company's existing outstanding indebtedness and support its ongoing growth, and that GMCR secured a financing commitment for the transaction from Bank of America Merrill Lynch and SunTrust Robinson Humphrey, Inc.

89.     The statements referenced above in ¶¶77, 78, 80, 83, 84 and 85 were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)     that the Company was engaged in improper accounting practices, which as Defendants have now admitted, materially misstated GMCR's reported financial results during the Class Period. Such improper accounting practices included the improper recognition and reporting of revenue on shipments of product to MBlock, improper recognition and reporting of royalty income and the improper understatement of customer incentive and marketing expenses;

- 31 -

    (b)     that the Company's internal controls were materially deficient;

    (c)     as a result of the foregoing, GMCR's Class Period financial statements, as

Defendants have now admitted, "should no longer [be relied ] upon," were not fairly presented in

conformity with GAAP and were materially false and misleading; and

    (d)     based on the foregoing, Defendants lacked a reasonable basis for their positive

statements about the Company and its prospects.

## The Truth Emerges

90.    On September 28, 2010, GMCR filed the September 28, 2010 Form 8-K with the

SEC, which stated, in pertinent part:

> In connection with its acquisition of LJVH Holdings, Inc., or Van Houtte, a leading gourmet coffee brand in Canada in the home and office channels, and the marketing of the associated $1.35 billion debt financing, the Company hereby furnishes the following information:

> Intercompany adjustment correction

> In connection with the preparation of its financial results for its fourth fiscal quarter, *the Company's management discovered an immaterial accounting error relating to the margin percentage it had been using to eliminate the inter-company markup in its K-Cup inventory balance residing at its Keurig business unit*. Management discovered that the gross margin percentage used to eliminate the inter-company markup resulted in a lower margin applied to the Keurig ending inventory balance *effectively overstating consolidated inventory and understating cost of sales*. Management determined that the accounting error arose during fiscal 2007 and analyzed the quantitative impact from that point forward to June 26, 2010.

> *As of June 26, 2010, there is a cumulative $7.6 million overstatement of pre-tax income. Net of tax, the cumulative error resulted in a $4.4 million overstatement of net income or a $0.03 cumulative impact on earnings per share*.

>           *     *     *

> SEC Inquiry

> *On September 20, 2010, the staff of the SEC's Division of Enforcement informed the Company that it was conducting an inquiry and made a request for a voluntary production of documents and information. Based on the request, the Company believes the focus of the inquiry concerns certain revenue recognition practices and the Company's relationship with one of its fulfillment vendors.* The Company,

at the direction of the audit committee of the Company's board of directors, is cooperating fully with the SEC staff's inquiry.

91.    In response to these adverse disclosures about the Company's accounting practices and the SEC's investigation of the Company's revenue recognition practices, the price of GMCR common stock, on September 29, 2010, fell $5.95 per share, or more than 16%, to close at $31.06 per share on about ten times the average trading volume.

### Post-Class Period Disclosures

92.    On November 19, 2010, GMCR issued a press release announcing that investors "should no longer rely upon" the Company's previously issued financial statements for fiscal years 2007, 2008, 2009 and the first three quarters of 2010 as they were materially misstated and included the following errors:

- A $7.6 million overstatement of pre-tax income, cumulative over the restated periods, due to the K-Cup inventory adjustment error previously reported in the Company's Form 8-K filed on September 28, 2010. This error is the result of applying an incorrect standard cost to intercompany K-Cup inventory balances in consolidation. This error resulted in an overstatement of the consolidated inventory and an understatement of the cost of sales. Rather than correcting the cumulative amount of the error in the quarter ended September 25, 2010, as disclosed in the September 28, 2010 Form 8-K, the effect of this error will be recorded in the applicable restated periods.

- A $1.4 million overstatement of pre-tax income, cumulative over the restated periods, due to the under-accrual of certain marketing and customer incentive program expenses. The Company also has corrected the classification of certain of these amounts as reductions to net sales instead of selling and operating expenses. These programs include, but are not limited to, brewer mark-down support and funds for promotional and marketing activities.   Management has determined that miscommunication between the sales and accounting departments resulted in expenses for certain of these programs being recorded in the wrong fiscal periods.

- A $1.0 million overstatement of pre-tax income, cumulative over the restated periods, due to changes in the timing and classification of the Company's historical revenue recognition of royalties from third party licensed roasters. Because royalties were recognized upon shipment of K-Cups by roasters pursuant to the terms and conditions of the licensing agreements with these roasters, Keurig historically recognized these royalties at the time Keurig purchased the K-Cups from the licensed roasters and classified this royalty in net sales.   Management has determined to recognize this royalty as a reduction to the carrying cost of the related inventory. The gross margin benefit of the royalty will then be realized upon the ultimate sale of

the product to a third party customer. Due to the Company's completed and, when consummated, pending acquisitions of third party licensed roasters, these purchases and the associated royalties have become less of a factor, since the post-acquisition royalties from these wholly-owned roasters are not included in the Company's consolidated financial statements.

- An $800,000 overstatement of pre-tax income, cumulative over the restated periods, due to applying an incorrect standard cost to intercompany brewer inventory balances in consolidation. This error was identified during the preparation of the fiscal year 2010 financial statements and resulted in an overstatement of the consolidated inventory and an understatement of the cost of sales.

- A $700,000 understatement of pre-tax income for the Specialty Coffee business unit, due primarily to a failure to reverse an accrual related to certain customer incentive programs in the second fiscal quarter of 2010. The over-accrual was not identified and corrected until the fourth fiscal quarter of 2010.

- In addition to the errors described above, the Company also will include in the restated financial statements certain other immaterial errors, including previously unrecorded immaterial adjustments identified in audits of prior years' financial statements.

The press release also stated that:

> *[N]one of the financial statement errors are related to the Company's relationship with M.Block & Sons*, the fulfillment vendor through which the Company makes a majority of the at-home orders for the Keurig business unit's single-cup business sold to retailers.

*     *     *

> In accordance with Section 404 of the Sarbanes-Oxley Act of 2002, the Company's management has been assessing the effectiveness of the Company's internal controls over financial reporting and disclosure controls. Based on this assessment, the Company expects to report a *material weakness in the Company's internal controls over financial reporting, and, therefore, conclude that internal controls over financial reporting as of September 25, 2010 are not effective*.

93.     Then, on December 9, 2010, the Company issued a press release announcing its

financial results for the fiscal fourth quarter and year ended September 25, 2010. For the quarter, the

Company reported net sales of $373.1 million and net income of $27 million, or $0.20 per diluted

share.

94.     Also on December 9, 2010, GMCR filed the 2010 Form 10-K with the SEC, which

revealed that GMCR's net income for the thirty-nine weeks ended June 26, 2010 had been overstated

by approximately *6.2%*. The 2010 Form 10-K also reiterated, in all material respects, the financial misstatements GMCR disclosed in the November 19, 2010 press release and disclosed that such misstatements were not associated with the Company's relationship with MBlock, which, as GMCR disclosed in the November 19, 2010 press release, the Company believed was the focus of the SEC's inquiry:

> In addition, *none of the financial statement errors are related to the Company's relationship with M.Block & Sons, Inc.*, the fulfillment entity through which the Company makes a majority of the at-home orders for the Keurig business unit's single-cup business sold to retailers.
>
> \*    \*    \*
>
> As previously disclosed, on September 20, 2010, the staff of the SEC's Division of Enforcement informed the Company that it was conducting an inquiry into matters at the Company.  The Company, at the direction of the audit committee of the Company's board of directors, is cooperating fully with the SEC staff's inquiry. At this point, we are unable to predict what, if any, consequences the SEC inquiry may have on us. However, the inquiry could result in considerable legal expenses, divert management's attention from other business concerns and harm our business. If the SEC were to commence legal action, we could be required to pay significant penalties and/or other amounts and could become subject to injunctions, an administrative cease and desist order, and/or other equitable remedies. *The filing of our restated financial statements to correct the discovered accounting errors will not resolve the SEC inquiry.  Further, the resolution of the SEC inquiry could require the filing of additional restatements of our prior financial statements, and/or our restated financial statements, or require that we take other actions not presently contemplated*. We can provide no assurances as to the outcome of the SEC inquiry.

95.    In addition, the 2010 Form 10-K disclosed material internal control weaknesses:

> *Background*
>
> As previously reported in the Company's Current Report on Form 8-K filed on November 19, 2010, on November 15, 2010, the board of directors of the Company, based on the recommendation of the audit committee and in consultation with management, concluded that the Company's previously issued financial statements for the fiscal years ended September 30, 2006, September 29, 2007, September 27, 2008 and September 26, 2009 and the first three fiscal quarters of 2010 should be restated in order to correct certain identified errors. Accordingly, the Company has restated its previously issued financial statements for those periods. . . .
>
> *Evaluation of Disclosure Controls and Procedures*

- 35 -

Under the supervision of and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, the Company conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) of the Securities and Exchange Act of 1934, as amended (the "Exchange Act"), as of September 25, 2010. The Company's evaluation has identified certain material weaknesses in its internal control over financial reporting as noted below in Management's Report on Internal Control over Financial Reporting. *Based on the evaluation of these material weaknesses, the Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures were not effective as of September 25, 2010 to ensure that information required to be disclosed by the Company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.* Based on a number of factors, including the completion of the Audit Committee's internal investigation, our internal review that identified revisions to our previously issued financial statements, and efforts to remediate the material weaknesses in internal control over financial reporting described below we believe the consolidated financial statements in this Annual Report fairly present, in all material respects, our financial position, results of operations and cash flows as of the dates, and for the periods, presented, in conformity with GAAP.

*Management's Report on Internal Control Over Financial Reporting*

*Management is responsible for establishing and maintaining adequate internal control over financial reporting*, as defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act. The Company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of its financial reporting and the preparation of its financial statements for external purposes in accordance with GAAP and includes those policies and procedures that: (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate.

Under the supervision of and with the participation of management, including the Chief Executive Officer and Chief Financial Officer, the Company conducted an

evaluation of the effectiveness of its internal control over financial reporting based on the criteria in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). A material weakness is a control deficiency, or combination of control deficiencies, such that there is a reasonable possibility that a material misstatement to the annual or interim financial statements will not be prevented or detected on a timely basis. Based upon that evaluation, management identified the following material weaknesses as of September 25, 2010 in the Company's internal control over financial reporting, principally related to the Company's period-end financial reporting and consolidation processes.

1.     *Financial statement consolidation process.* **The Company did not have effective controls to ensure the completeness and accuracy of the accounting for intercompany transactions** in its financial statement consolidation process. The method used to identify all intercompany transactions between the business segments for purposes of performing required eliminations, and to process and to document the eliminations, was not accurately designed and adequately performed during each reporting period.

2.     *Accruals related to marketing and customer incentive programs.* **The Company did not have effective controls to ensure the completeness, accuracy and proper classification of certain marketing and customer incentive programs and related accrued liabilities.** There was a lack of adequate communication between the accounting function to gather the appropriate information from the sales and marketing functions to accurately classify these liabilities and an insufficient number of personnel with an appropriate level of GAAP knowledge and experience evaluating the transactions related to these programs.

These material weaknesses resulted in the misstatement and audit adjustments of financial statement line items and related financial disclosures, as disclosed in Note 3, *Restatement of Previously Issued Financial Statements*, to our consolidated financial statements.

As a result of the material weaknesses in internal control over financial reporting described above, management concluded that the Company's internal control over financial reporting was not effective as of September 25, 2010 based on the criteria established in Internal Control-Integrated Framework issued by the COSO. Additionally, these material weaknesses could result in a misstatement of the aforementioned account balances or disclosures that would result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected.

Management's assessment of the effectiveness of the Company's internal control over financial reporting as of September 25, 2010 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report which appears herein.

*Plan for Remediation of the Material Weaknesses in Internal Control Over Financial Reporting*

Management has been actively engaged in the planning for, and implementation of, remediation efforts to address the material weaknesses, as well as other identified areas of risk. These remediation efforts, outlined below, are intended both to address the identified material weaknesses and to enhance the Company's overall financial control environment. Management believes that these material weaknesses arose due to the Company's rapid growth, both organically and through acquisitions, outpacing the development of the Company's accounting infrastructure.

*Management's planned actions to further address these issues in fiscal 2011 include:*

- *the addition of more experienced accounting staff at the Company's enterprise and business segment levels;*

- *a formal training program for all accounting and finance personnel, so that they remain current with accounting rules, regulations and trends as well as a formal training program for sales and marketing personnel;*

- *a thorough review of the finance and accounting departments to ensure that the areas of responsibilities are properly matched to the staff competencies and that the lines of communication and processes are as effective as possible;*

- *a thorough review of the processes and procedures used in the Company's intercompany accounting, including an evaluation of possible methods to simplify and automate certain aspects of the intercompany accounting;*

- *development of a standardized method for the review, approval, and tracking of retail customer marketing and incentive programs, pricing and other key terms and conditions; and*

- *an evaluation of the Company's key accounting policies to ensure that they are documented and standardized across business units, circulated within the appropriate Company constituencies, and reviewed and updated on a periodic basis with an view towards the interrelations of the policies across the enterprise.*

The audit committee has directed management to develop a detailed plan and timetable for the implementation of the foregoing remedial measures (to the extent not already completed) and will monitor their implementation. In addition, under the direction of the audit committee, management will continue to review and make necessary changes to the overall design of the Company's internal control environment, as well as policies and procedures to improve the overall effectiveness of internal control over financial reporting.

Management believes the measures described above and others that will be implemented will remediate the control deficiencies the Company has identified and strengthen its internal control over financial reporting. Management is committed to continuous improvement of the Company's internal control processes and will continue to diligently review the Company's financial reporting controls and procedures. As management continues to evaluate and work to improve internal control over financial reporting, the Company may determine to take additional

measures to address control deficiencies or determine to modify, or in appropriate circumstances not to complete, certain of the remediation measures described above.

96.     The market for GMCR common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, GMCR common stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired GMCR common stock relying upon the integrity of the market price of GMCR common stock and market information relating to GMCR, and have been damaged thereby.

97.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of GMCR common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

98.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about GMCR's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of GMCR and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

### Additional Scienter Allegations

99.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding GMCR, their control over, and/or receipt and/or modification of GMCR's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning GMCR, participated in the fraudulent scheme alleged herein.

100.    Moreover, the fraudulent course of conduct alleged herein enabled Defendants to procure $1.35 billion of debt financing on favorable terms so that GMCR could acquire LJVH Holdings, Inc., as well as to refinance the Company's existing outstanding indebtedness and support the Company's ongoing growth.

101.    Defendants were further motivated to engage in the fraudulent course of conduct alleged herein in order to raise much needed capital by enabling GMCR to sell $250 million of its securities to Lavazza in a private transaction at artificially inflated prices during the Class Period. Specifically, GMCR obtained a higher purchase price from Lavazza for its equity stake than it would have received had the need for a restatement of past financial reporting and/or the existence of an SEC investigation been disclosed prior to September 28, 2010.

102.    In addition, the alleged improprieties noted herein enabled certain Company insiders, namely McCreary and Stacy, the Presidents of GMCR's two business segments, to exercise and sell large amounts of their GMCR shares in August 2010.  For example, McCreary, who realized a gain

of more than a $6.3 million, sold 200,000 shares on August 18, 2010, leaving him with 97,488

shares of GMCR stock outstanding. Similarly, between August 13, 2010 and November 5, 2010,

Stacy, who realized a gain of more than $1.3 million, sold 50,000 shares, leaving her with 1,994

shares of GMCR stock outstanding:

| Insider | Date | Shares | Price | Proceeds |
|---------|------|--------|-------|----------|
| R. SCOTT MCCREARY | 08/18/10 | 200,000 | $33.08 | $6,616,000 |
| | | | | |
| MICHELLE STACY | 08/13/10 | 30,000 | $30.95 | $928,500 |
| | 09/13/10 | 5,000 | $35.40 | $177,000 |
| | 09/21/10 | 4,375 | $37.00 | $161,875 |
| | 09/21/10 | 625 | $37.00 | $23,125 |
| | 11/05/10 | 10,000 | $35.00 | $350,000 |
| | | 50,000 | | $1,640,500 |
| | | | | |
| | Total: | 250,000 | | $8,256,500 |

103.    Prior to these sales, there had not been significant insider trading activity since June

2009. Not only did both division presidents sell the majority of their shares, but Stacy did so the day

after the SEC's information request and one week before GMCR made the SEC inquiry public.

104.    Even worse, in October 2010, Stacy amended her Form 4s for the August and

September sales, claiming that she forgot to include in the original Form 4s that the sales were made

pursuant to a Rule 10b5-1 trading plan adopted on August 13, 2010. Not only did the Company fail

to inform the SEC of the plan on the day it was adopted, but it failed to disclose the plan when

Stacy's Form 4 for the $928,500 sale was filed a mere four days after its adoption.

### Loss Causation/Economic Loss

105.    During the Class Period, as detailed herein, Defendants engaged in a scheme to

deceive the market and a course of conduct that artificially inflated the prices of GMCR common

stock and operated as a fraud or deceit on Class Period purchasers of GMCR common stock by

failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior

misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the

price of GMCR common stock fell precipitously as the prior artificial inflation came out. As a result

of their purchases of GMCR common stock during the Class Period, Plaintiffs and the other Class

members suffered economic loss, *i.e.*, damages, under the federal securities laws.

106.    By failing to disclose to investors the adverse facts detailed herein, Defendants

presented a misleading picture of GMCR's business and prospects.   Defendants' false and

misleading statements had the intended effect and caused GMCR common stock to trade at

artificially inflated levels throughout the Class Period, reaching as high as $37.55 per share on

September 27, 2010.

107.    On September 28, 2010, GMCR filed a Form 8-K with the SEC, which disclosed that:

(i) the Company's management discovered an immaterial accounting error; and (ii) the SEC's

Division of Enforcement was conducting an inquiry and made a request for a voluntary production

of documents and information. The Form 8-K indicates that the Company believes the nature of the

SEC's investigation "concerns certain revenue recognition practices and the Company's relationship

with one of its fulfillment vendors," namely MBlock.

108.    In response to the announcement that the SEC was examining the Company's revenue

recognition practices, on September 29, 2010, the price of GMCR common stock fell $5.95 per

share, or more than 16%, to close at $31.06 per share on about ten times the average trading volume.

109.    The above-noted decline in the price of GMCR common stock was a direct result of

the nature and extent of Defendants' fraud being revealed to investors and the market. The timing

and magnitude of the price decline in GMCR common stock negates any inference that the loss

suffered by Plaintiffs and the other Class members was caused by changed market conditions,

macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent

conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a

direct result of Defendants' fraudulent scheme to artificially inflate the prices of GMCR common

stock and the subsequent significant decline in the value of GMCR common stock when Defendants'

prior misrepresentations and other fraudulent conduct were revealed.

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine

110.    At all relevant times, the market for GMCR common stock was an efficient market

for the following reasons, among others:

(a)    GMCR common stock met the requirements for listing, and was listed and

actively traded on the NASDAQ, a highly efficient and automated market;

(b)    as a regulated issuer, GMCR filed periodic public reports with the SEC and

the NASDAQ;

(c)    GMCR regularly communicated with public investors via established market

communication mechanisms, including regular disseminations of press releases on the national

circuits of major newswire services and other wide-ranging public disclosures, such as

communications with the financial press and other similar reporting services; and

(d)    GMCR was followed by several securities analysts employed by major

brokerage firms who wrote reports which were distributed to the sales force and certain customers of

their respective brokerage firms.  Each of these reports was publicly available and entered the public

marketplace.

111.    As a result of the foregoing, the market for GMCR common stock promptly digested

current information regarding GMCR from all publicly available sources and reflected such

information in the prices of the stock.  Under these circumstances, all purchasers of GMCR common

stock during the Class Period suffered similar injury through their purchase of GMCR common

stock at artificially inflated prices and a presumption of reliance applies.

**No Safe Harbor**

112.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of GMCR who knew that those statements were false when made.

**COUNT I**

**Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder
Against All Defendants**

113.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

114.   During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

115.   Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not

misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

116.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for GMCR common stock. Plaintiffs and the Class would not have purchased GMCR common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

117.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of GMCR common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

118.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

119.    The Individual Defendants acted as controlling persons of GMCR within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of GMCR, and their ownership of GMCR common stock, the Individual Defendants had the power and authority to cause GMCR to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: February 18, 2011

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD

_____

DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

GLANCY BINKOW & GOLDBERG LLP
LIONEL Z. GLANCY
MICHAEL GOLDBERG
ROBERT V. PRONGAY
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone: 310/201-9150
310/201-9160 (fax)

Co-Lead Counsel for Plaintiffs

WOODWARD & KELLEY, PLLC
PHILIP C. WOODWARD
1233 Shelburne Road, Suite D-3
South Burlington, VT 05403
Telephone: 802/652-9955
802/652-9922 (fax)

LAW OFFICE OF BRIAN HEHIR
BRIAN HEHIR
239 South Union Street
Burlington, VT  05401
Telephone:  802/862-2006
802/862-2301 (fax)

Co-Liaison Counsel

**CERTIFICATE OF SERVICE**

I hereby certify that on February 18, 2011, a copy of the foregoing was submitted for filing with the Clerk of the Court and served by mail on all counsel of record.

DATED: February 18, 2011

ROBBINS GELLER RUDMAN
   & DOWD LLP
DAVID A. ROSENFELD

_____
DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

- 48 -