UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

JERZY WARCHOL et al,         :
Individually and on Behalf   :
of all Others Similarly      :
Situated,                    :
                             :
          Plaintiffs,        :          Case No. 2:10-cv-227
                             :          (Consolidated)
          v.                 :
                             :
GREEN MOUNTAIN COFFEE        :
ROASTERS, INC., et al.,      :
                             :
          Defendants.        :


Opinion and Order:
Defendants' Motions to Dismiss

This suit is a securities fraud class action brought

against Green Mountain Coffee Roasters, Inc. ("GMCR" or the

"Company"), its CEO, Lawrence Blanford, its CFO, Frances Rathke,

and its founder and current Chairman of the Board of Directors,

Robert Stiller (collectively, the "Defendants").[1]  Before the

Court are motions to dismiss filed by each of the Defendants,

ECF Nos. 33-35, which came before the Court on a January 5, 2012

hearing, see Mots. to Dismiss Hr'g Tr. ("Tr."), ECF No. 56.

After considering the parties' extensive written and oral

argument, the Court concludes Plaintiffs do not allege material

misstatements attributable to Stiller.  Nor do they allege facts

---

[1]     Blanford, Rathke, and Stiller will be referred to
collectively as the "Individual Defendants."

that collectively give rise to a "strong inference" of scienter on the part of any of the other Defendants, a pleading requirement imposed by The Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(2)(A).  As a consequence, the Court **grants** each of the motions to dismiss without prejudice to Plaintiffs to move to amend their complaint within 30 days of this order.

### Background

In setting out the facts below, the Court generally assumes the truth of the factual allegations in the complaint, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), but not if they conflict with "the plain language of the publicly filed disclosure documents."  *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) (internal citation and quotation omitted).  The Court may also consider, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322.  This includes public disclosure documents filed with the SEC as required by law, as well as documents "possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  The Court is also permitted to take judicial notice of stock prices. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 n.8 (2d Cir. 2000).

I.      **The Parties and Legal Claims**

Plaintiffs are a putative class of purchasers of GMCR stock between July 28, 2010 and September 28, 2010 (the "Class Period") who principally allege violations of § 10(b) of the Exchange Act of 1934, 15 U.S.C. § 78j(b).[2]  They also allege the Individual Defendants were "controlling persons," under § 20(a) of the Exchange Act of 1934, 15 U.S.C. § 78t(a).  That provision holds jointly and severally liable those defendants who "directly or indirectly, control[ ]" persons who have violated the securities laws, except "if the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  *Id.*

---

[2]      § 10(b) is implemented by SEC regulation at 17 C.F.R. § 240.10b-5, which provides:

It shall be unlawful for any person, directly or indirectly . . .

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

For ease of reference, § 10(b) and 17 C.F.R. § 240.10b-5 are collectively labeled throughout the opinion as "§ 10(b)."

Plaintiffs charge Defendants with making misrepresentations that led them to purchase GMCR shares at inflated prices during the Class Period.  Consol. Class Action Compl. ("Compl.") ¶ 116, Feb. 23, 2011, ECF No. 26.

GMCR is a Delaware corporation headquartered in Vermont that sells specialty coffee, coffee makers, and related beverage products.  It roughly divides its operations into two departments, Keurig, which it acquired in 2006, and the Specialty Coffee Business Unit ("SCBU").  Keurig concentrates in selling a patented brewing device of the same name that produces ready-to-drink beverages from K-Cups—single serving portions of dried coffee, tea, or other products.  SCBU sells coffee in K-Cups as well as in other packaging.  In recent years, the Company has experienced rapid growth, with its stock price rising from a low of $5.41 per share in Fiscal Year ("FY") 2008 to a high of more than $37 in FY 2010, just prior to the end of the Class Period.  GMCR 2010 10-K, GMCR Mem. in Supp. Mot. to Dismiss Ex. 1 ("2010 10-K"), at 29, ECF No. 35-3.  In FY 2010, it made $1.36 B in net sales.  2010 10-K at 31.  In August 2010, *Fortune* magazine recognized GMCR as number two on its list of the nation's hundred fastest growing companies.  Compl. ¶86.

## II.   Class Period Events

The start of the Class Period, July 28, 2010, coincides with Defendants' release of the Company's third quarter 2010

earnings figures.  The market reacted positively to the reports:
the following day, the Company's share price rose nine percent,
from $28.67 to $31.36.  Compl. ¶ 79.  On August 5, GMCR filed
its 10-Q quarterly financial statement with the SEC (the "Q3 10-
Q"), signed by CEO Blanford and CFO Rathke.  The Q3 10-Q
represented that the Company's management, including the CEO and
CFO, had reviewed GMCR's "disclosure controls and procedures"
and that the CEO and CFO found them "effective."  Compl. ¶¶ 80,
83.  It reported that so far that fiscal year, GMCR's pre-tax
income was nearly $99 MM, up from about $67 MM the year prior.

On August 10, 2010, GMCR announced a stock purchase
agreement with Italian coffeemaker Luigi Lavazza S.p.A
("Lavazza"), in which Lavazza would buy $250 MM worth of GMCR
shares, valued based on the sixty-day weighted average closing
price of the stock.  The deal closed on the final day of the
Class Period, September 28, 2010.  On September 14, GMCR
announced another transaction, in which it would purchase all
outstanding shares of a Canadian competitor, Van Houtte, for
C$915 million, financed in part by a $1.35 B credit facility.
The deal closed December 17, 2010.

On August 13, Michelle Stacy, President of Keurig, made the
first of several Class Period stock trades, selling 30,000
shares for $30.95 each.  Stacy also sold 10,000 total shares on
September 13 and 21, yielding a Class Period total of $1.3 MM.

As further outlined below, the September 21 sale came one day after GMCR reported learning it was under investigation by the SEC.  Although Stacy disclosed in an October correction to her previous Form 4 stock sale filing that at least some of the transactions had been pursuant to a Rule 10b5-1 trading plan,[3] she did not note the plan when making the trades initially.  On August 18, Scott McCreary, President of SCBU, sold 200,000 shares at a price of $33.08 each, realizing more than $6.6 MM. The complaint alleges these were the first significant insider trades made by Company officers since June 2009.  As GMCR points out and Plaintiffs do not contest, both sets of sales involved the exercise and sale of options, amounting to approximately 20 percent of the two presidents' total holdings.  GMCR Mem. 21-22.

Bookending the Class Period, on September 28, 2010, GMCR issued a Form 8-K announcing that "management [had] discovered

---

[3]      SEC Rule 10b5-1 provides affirmative defenses to securities fraud allegations of trading "'on the basis of' material nonpublic information."  17 C.F.R. § 240.10b5-1.  The insider may defend her trades by asserting they were pursuant to a "written plan for trading securities," drafted prior to the insider learning of the material non-public information at issue in the suit.  *Id*. at (c)(1)(i)(A).  The plan must list the amount and price of the securities to be sold or purchased, provide the date of the transaction, and prevent the insider from exercising "any subsequent influence over how, when, or whether to effect purchases or sales."  *Id*. at (c)(1)(i)(B).  In addition, the trade must have been executed according to the plan's terms.  *Id*. at (c)(1)(i)(C).  Finally, the plan must have been composed "in good faith and not as part of a plan or scheme to evade the prohibitions of this section."  *Id*. at (c)(1)(ii).

an immaterial accounting error" while preparing GMCR's fourth quarter financial statements. Compl. ¶ 90. The 8-K also revealed that on September 20, 2010 the SEC had requested evidence from the Company in connection with an investigation GMCR believed to relate to "certain revenue recognition practices and the Company's relationship with one of its fulfillment vendors." Compl. ¶ 90.[4] GMCR's stock price dropped from $37.55 on September 27, its highest level during the Class Period, to $31.06 one day after the announcement. Compl. ¶¶ 106-08. It reached a post-announcement nadir of $26.87 on October 11, 2010 before returning to its steady growth. GMCR Historic Stock Prices: July 28, 2010 – Apr. 21, 2011, GMCR Mem. Ex. 3, at 4, ECF No. 35-5.[5]

On November 19, GMCR issued a press release warning investors that, based on the recommendation of an internal

---

[4]    A confidential source told Plaintiffs that Company employees had known of an SEC investigation months earlier, in May 2010 at the latest. Compl. ¶¶ 68-69.

[5]    In spite of the negative disclosures, the Company's stock price rose above its Class Period high less than two months after the September 28 8-K, attaining $37.63 on November 26. *Id.* The price dipped again to a low of $31.57 in December, in the immediate wake of the Company's 2010 10-K and earnings restatement discussed below, but then returned to growth. *Id.* On March 28, 2011, six months after the 8-K, the price was $62.70 per share. GMCR Historical Share Prices, Yahoo! Finance, *available at* http://finance.yahoo.com/q?s=gmcr&ql=1 (last visited Jan. 23, 2012). On the one-year anniversary of the 8-K the price stood at $103.88. *Id.* As of January 20, 2012, the stock was worth $50.90. *Id.*

audit, the Company would restate its earnings for FYs 2007-09 and the first three quarters of FY 2010.  For that reason, it told investors they should no longer rely upon the Company's previous reports for those periods.  It noted that GMCR "expects to report a material weakness in the Company's internal controls over financial reporting."  Compl. ¶ 92.  It advised, however, that none of the irregularities implicated management or employee misconduct or related to GMCR's relationship with MBlock & Sons, Inc. ("MBlock"), an Illinois third party fulfillment entity for Keurig that presumably was the vendor under review by the SEC.

On December 9, 2010, GMCR filed its FY 2010 10-K, signed by Rathke, CEO Blanford, Chairman Stiller, and the Board of Directors.  The report revealed the Company's conclusions as to the extent of the accounting errors and the revisions required in response.  It announced GMCR had restated its financial statements from FYs 2006-10.  GMCR repeated its assertion that no errors were due to misconduct by management or employees or related to MBlock.  It noted that GMCR was continuing to cooperate with the SEC.  As relevant to this litigation, it corrected the following errors revealed by the internal audit: a $7.4 million pre-tax income overstatement due to the method for calculating K-Cup inventory; a $0.7 million pre-tax income overstatement related to inter-company brewer inventory; and

$1.0 million overstatement of pre-tax income because Keurig had recognized royalty payments as income when it purchased K-Cups from licensed third party brewers for re-sale.  2010 10-K at 4-5.  It revealed the Company's Q3 10-Q had overstated 39-week earnings by approximately 6.2 percent.  Compl. ¶ 94.  Since the restatement also uncovered some understatements in past financials, it yielded a net overstatement of cumulative income from FY 2006 – FY 2010 of $6.06 MM.  2010 10-K at 5.

        As it predicted in November, GMCR announced it had "identified certain material weaknesses in its internal control over financial reporting," and that its CEO and CFO had determined "the Company's disclosure controls and procedures were not effective as of September 25, 2010."  Compl. ¶ 95.[6]  It elaborated that those shortcomings included failures to account for transactions between the Company's business segments.  Compl. ¶ 95; 2010 10-K at 56.  PricewaterhouseCoopers LLP ("PWC"), as independent accountant, provided an audit opinion affirming the restatement.  2010 10-K at 65-66.

---

        [6]     As defined in the 10-K, a "material weakness is a control deficiency, or combination of control deficiencies, such that there is a reasonable possibility that a material misstatement to the annual or interim financial statements will not be prevented or detected on a timely basis."  2010 10-K at 56.

## Discussion

To state a § 10(b) claim, Plaintiffs must sufficiently allege Defendants: (1) "made misstatements or omissions of material fact," with (2) requisite scienter. *ATSI*, 493 F.3d at 105.[7]  Under Federal Rule of Civil Procedure 8(a)(2), Plaintiffs' complaint must contain factual allegations sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1953 (2009).  Further, it is subject to Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). *ATSI*, 493 F.3d at 105.  Rule 9(b) requires the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).

Congress supplemented the Federal Rules provisions with the

---

[7]      Plaintiffs also must show: that the misrepresentations were (3) "in connection with the purchase or sale of securities"; (4) that Plaintiffs relied on the misrepresentations; and (5) that such reliance proximately caused Plaintiffs' injury. *Id.*  Defendants do not challenge Plantiffs' pleadings on those three additional fronts, nor need the Court evaluate them here.

PSLRA's more exacting standards.  *ATSI*, 493 F.3d at 99.  The

PSLRA mandates securities fraud complaints:

> specify each statement alleged to have been
> misleading, the reason or reasons why the statement is
> misleading, and, if an allegation regarding the
> statement or omission is made on information and
> belief, the complaint shall state with particularity
> all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).  Concerning scienter, the PSLRA

requires the complaint "state with particularity facts giving

rise to a strong inference that the defendant acted with the

required state of mind."  *Id.* § 78u-4(b)(2)(A).  Failure to meet

the PSLRA's specifications requires granting a motion to

dismiss.  *Id.* § 78u-4(b)(3)(A); *ATSI*, 493 F.3d at 99.

**I.      Misstatements or Omissions of Material Fact**

      The complaint details false statements connected to the

release of GMCR's 2010 third quarter earnings for the 39-week

period then-ended: the press release, the earnings call, the Q3

10-Q, and the related certifications and representations about

the Company's financial figures and disclosure controls

contained within them (collectively, the "Q3 Statements").  The

complaint further describes that the statements were made by

Blanford and Rathke, as CEO and CFO, on behalf of the Company.

Plaintiffs then allege the Q3 Statements were later proven

falsely inflated both by the Company's 2010 10-K, which restated

earnings and admitted to faulty disclosure controls, and the

11

improper inventory and accounting practices involving MBlock to which the Company did not admit, but which Plaintiffs' allege occurred based on confidential witness ("CW") reports.  Finally, Plaintiffs describe that they relied to their detriment on those misstatements, purchasing GMCR shares at an overly high price.

The parties spar vigorously over MBlock, which this opinion takes up in detail in relation to scienter.  However, there is little debate that the Q3 Statements, regardless of the MBlock practices, were false—GMCR admitted as much in restating them. *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004) ("the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made.").  Nor must the Court resolve the MBlock debate to decide whether the misstatements were "material."  That question requires the Court to assess whether "'there is a substantial likelihood that a reasonable shareholder would consider [the information] important in deciding how to [act].'"  *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)) (internal quotations omitted).  Put differently, the misstatement must "significantly alter[ ] the 'total' mix of information available" to the reasonable investor.  *Id.*

12

Useful in the materiality analysis is an SEC internal guidance document, Staff Accounting Bulletin No. 99 ("SAB 99"), 64 Fed. Reg. 45,150, which provides that both quantitative and qualitative factors are significant.  *ECA*, 553 F.3d at 197. Materiality is a mixed question of fact and law, so courts will only remove the issue from the finder of fact if the statements in question are "'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'"  *ECA*, 553 F.3d at 197 (quoting *Ganino*, 228 F.3d at 162) (internal quotation omitted).

Plaintiffs' allegations, at the least, meet that low threshold.  For one, the misstatements led to a restatement, which, according to GAAP, is only appropriate when an error is "material." *In re Atlas Air*, 324 F. Supp. 2d at 486.  Further, the value of the restatement for the 39-week period covered by the Q3 Statements was approximately 6.2 percent.  Compl. ¶ 94. As a five percent threshold is a "good starting place for assessing the materiality of the alleged misstatement," *ECA*, 553 F.3d at 204, the magnitude of the changes also argue for materiality.

Although changes in stock price are alone "too blunt an instrument to be depended on" to gauge materiality, SAB 99, 64 Fed. Reg. at 45152 (internal quotation omitted), GMCR's shares rose nine percent the day after the third quarter earnings

announcements, and dropped more than sixteen percent the day after GMCR disclosed the accounting errors.  Compl. ¶¶ 79, 106-08.  Finally, the nature of the errors—particularly the admission that the Company's internal disclosure controls, rather than being "effective," Compl. ¶¶ 80, 83, suffered from "certain *material* weaknesses," Compl. ¶ 95 (emphasis added)—indicates systemic flaws that a reasonable investor would consider important in evaluating a company.  *See Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 606-07 (S.D.N.Y. 2009) (finding statements by the defendant company were actionable that referred to improving deficient internal controls when plaintiffs alleged facts indicating the controls were far weaker than portrayed publicly).

Plaintiffs' claims begin to fray, however, at the point of connecting a material misstatement to Stiller.[8]  In general, Rule 9(b) requires "inform[ing] each defendant of the nature of his alleged participation in the fraud."  *DiVittorio v. Equidyne Extractive Indus.*, 822 F.2d 1242, 1247 (2d Cir. 1987).  Stiller did not sign the Q3 10Q.  Plaintiffs do not allege he made public claims related to the Company's earnings or helped compile or certify the Q3 Statements.

---

[8]    GMCR, Blanford, and Rathke do not dispute the Q3 Statements are attributable to them.

Rather than tie Stiller to the Q3 Statements directly, Plaintiffs argue that he was responsible on the basis of the Group Pleading Doctrine. *See Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir. 1986). The doctrine pre-dates the PSLRA and developed as an exception to Rule 9(b). *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005). It is "extremely limited in scope." *SEC v. Espuelas*, 699 F. Supp. 2d 655, 660 (S.D.N.Y. 2010) (internal citation and quotation omitted). It "'allows plaintiffs to rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company.'" *In re Van der Moolen Holding N.V.*, 405 F. Supp. 2d 388, 399 (S.D.N.Y. 2005) (quoting *Polar Int'l Brokerage Corp. v. Reeve,* 108 F. Supp. 2d 225, 237 (S.D.N.Y. 2000)) (internal quotation omitted).[9]

---

[9]      Some circuits have rejected the doctrine as conflicting with the commands of the PSLRA. *Winer Family Trust v. Queen*, 503 F.3d 319, 337 (3d Cir. 2007); *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 365 (5th Cir. 2004); *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008). The Second Circuit has not addressed whether the doctrine survived the PSLRA, but it has at least suggested that district courts must still consider it. *Ill. State Bd. of Inv. v. Authentidate Holding Corp.*, 369 F. App'x 260, 266 (2d Cir. 2010) (unpublished decision). District courts have continued to apply it. *In re Van der Moolen*, 405 F. Supp. 2d at 399 ("The majority rule in this district is that the group pleading doctrine has survived the PSLRA.").

Nowhere does the complaint allege with particularity Stiller's participation in the daily business of the Company. *In re BISYS*, 397 F. Supp. 2d at 440-41.  In fact, the only allegation the complaint makes specifically as to Stiller is that he is the Company's founder and Board Chairman and an "Individual Defendant" in this action.  Compl. ¶¶ 17, 20. Otherwise, it makes broad assertions as to the roles of the "Individual Defendants" or the "Defendants."  *See, e.g.*, Compl. ¶¶ 21-25, 97-98, 114, 119.  That is not enough.  *Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 493 (S.D.N.Y. 2005) ("A number of courts have recognized that such indiscriminate defendant 'clumping' does not adhere to the particularity standards of Fed. R. Civ. P. 9(b) and the PSLRA.").

Plaintiffs' response brief, drawing from GMCR SEC filings, adds detail to the complaint's description.  Still, only some of those facts at all advance the proposition that Stiller was involved in the Company's routine affairs, like his 12 percent ownership stake in GMCR, his occasional role as an advisor to management, or that, when CEO and as Chairman, he signed other financial statements that were covered by the restatement. Pls'. Omnibus Opp'n to Mots. to Dismiss 18-19 & n.22. Otherwise, the additional information favors the view Stiller no longer was participate in daily business decisions.  As Plaintiffs describe, he chaired GMCR's Corporate Social

16

Responsibility Committee and relinquished many of the
traditional duties of a Board Chairman to another director.
Opp'n 18-19 & n.24.  That description is insufficient to allege
Stiller had an active role in the Company's everyday work.

As a result, the complaint does not adequately plead
Stiller's role in the alleged securities fraud, failing to
attribute a material misstatement or omission to him.  In
accordance with the PSLRA, the Court grants his motion to
dismiss.  As to GMCR, Blanford, and Rathke, however, the
complaint meets the pleading requirements: it specifies
material, false statements, describes the time and place at
which they were made, names their authors, and explains why they
were false.  As to those Defendants, the Court advances to the
second prong, scienter.

## II.    Scienter

The PSLRA requires each complaint "state with particularity
facts giving rise to a *strong inference* that the defendant acted
with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A)
(emphasis added).  Plaintiffs may demonstrate scienter on a
showing of either: (1) "both motive and opportunity to commit
the fraud" or (2) "strong circumstantial evidence of conscious
misbehavior or recklessness."  *ATSI*, 493 F.3d at 99.  An
inference is strong "only if a reasonable person would deem [it]
cogent and at least as compelling as any opposing inference one

17

could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.
As such, the Court's inquiry is holistic, based on the totality
of the facts alleged, and comparative, judged relative to non-
fraudulent inferences. *Id.* at 322-23.

Plaintiffs must allege scienter adequately as to each
individual defendant, and the Group Pleading Doctrine does not
apply to the mental state prong. *Teamsters Allied Benefit Funds*
*v. McGraw*, No. 09-cv-140 (PGG), 2010 WL 882883, at *11 n.6
(S.D.N.Y. Mar. 11, 2010).  To establish scienter on the part of
the Company, Plaintiffs must allege facts creating a "strong
inference that someone whose intent could be imputed to the
corporation acted with the requisite scienter," even if that
person is not an Individual Defendant. *Teamsters Local 445*
*Freight Div. Pension Fund v. Dynex Capital Inc.* ("*Dynex*"), 531
F.3d 190, 195-96 (2d Cir. 2008).  The Court begins by reviewing
Plaintiffs' allegations of Defendants' scienter individually and
then turns to whether their sum total is at least as compelling
as opposing inferences drawn from the events.

A. Motive and Opportunity to Commit the Fraud

A motive is a "concrete benefit[ ] that could be realized
by one or more of the false statements and wrongful
nondisclosures alleged." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d
Cir. 2000) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d

1124, 1130 (2d Cir. 1994)).[10]  Plaintiffs posit two fraudulent motives: permitting lucrative insider stock sales and gaining leverage for the Company in Class Period transactions.  Neither proposed motive contributes to an inference of scienter.

> ### 1.  *Insider Stock Sales*

A plaintiff successfully alleges motive in demonstrating "corporate insiders . . . ma[de] a misrepresentation in order to sell their own shares at a profit." *ECA*, 553 F.3d at 198. Plaintiffs argue Keurig President Michelle Stacy's and SCBU President Scott McCreary's stock sales were such trades.  Compl. ¶¶ 102-05.  Evidence of fraudulent trading lies in "unusual insider trading activity during the class period." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995).  A trade is "unusual," if "'in amounts dramatically out of line with prior trading practices and at times calculated to maximize personal benefit from undisclosed inside information.'"  *In re Gildan Activewear, Inc. Sec. Litig.*, 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009) (quoting *In re Glenayre Techs., Inc. Sec. Litig.,* No. 96-cv-8252 (HB), 1998 WL 915907, at *4 (S.D.N.Y. Dec. 30, 1998)). The inquiry is highly context-specific.  *Russo v. Bruce*, 777 F.

---

[10]   Defendants do not object to the complaint's allegations of "opportunity" to commit fraud, *see* Compl. ¶ 23, which is defined as "the means and likely prospect of achieving concrete benefits by the means alleged." *Novak*, 216 F.3d at 307.

Supp. 2d 505, 517 (S.D.N.Y. 2011); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) ("There is no guide for determining whether certain insider trades are unusual or suspicious in amount.").

Here, the complaint alleges some grounds for suspicion. Stacy's and McCreary's were the first significant trades by Company officers since June 2009. The timing might also raise eyebrows, given that Stacy sold 5000 shares on September 21, a week before GMCR announced the SEC investigation and restatement, and one day after the Company claimed it was first contacted by the SEC. *See In re Oxford Health Plans*, 187 F.R.D. at 139 ("[t]rades made a short time before a negative public announcement are suspiciously timed."). In fact, relying on a CW report discussed in the section on Plaintiffs' allegations of conscious recklessness that follows, Plaintiffs argue Stacy and McCreary should have been aware of the SEC inquiry well before making any of their trades, in May 2010 at the latest. Compl. ¶¶ 68-69. Moreover, the trades were sizable, amounting to about twenty percent of both presidents' stock and options[11] and yielding $1.3 MM and $6.6 MM during the Class Period. Finally, use of a Rule 10b5-1 trading plan ordinarily weighs heavily

---

[11]    Although it is an issue of controversy, "the weight of authority" favors taking account of both options and stock in the denominator when calculating the relative magnitude of an insider's sales. *In re Gildan Activewear*, 636 F. Supp. 2d at 271 n.5.

against finding motive, *see, e.g.*, *In re Gildan Activewear*, 636
F. Supp. 2d at 272, but here the timing and coverage of Stacy's
plan is unclear.

Nonetheless, the balance of the factors does not support
viewing the trades as evidence of fraudulent motive on the part
of the Company.  Chiefly, the complaint does not allege any
Individual Defendant or other insider sold stock during the
Class Period.  *See Acito*, 47 F.3d at 54; *San Leandro Emergency
Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d
801, 814 (2d Cir. 1996).  Nor do Plaintiffs specifically contend
Stacy or McCreary were parties to the fraud.  *Russo*, 777 F.
Supp. 2d at 517-18 (finding it "[f]urther problematic for
plaintiffs' theory" that Oppenheimer, an outside director and
the sole defendant alleged to have engaged in insider trading,
was not alleged to have "participated in the fraud.").  Instead
of selling, a number of GMCR directors actually made modest
stock purchases during the Class Period.  GMCR Mem. Exs. 19-22,
ECF Nos. 21-24.

The basis offered in the complaint to assume that Stacy
and McCreary were aware of an SEC investigation related to
MBlock in May 2010 is weak, as described *infra*.  Even if it were
taken as true, however, other than Stacy's September 21 sale,
none of the transactions took place near the dates on which the
officers were likely to maximize profits on the basis of that

knowledge.  *See City of Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 476 (S.D.N.Y. 2008) ("Bernhard did not sell his stock at the end of the putative class period, when insiders would have 'rushed to cash out' before the financial statements were restated," when Bernhard sold his stock more than ten weeks before the company announced a restatement.).

More importantly, Blanford actually added to his GMCR stock after the alleged earlier SEC disclosure, exercising options to purchase and retain 15,000 shares on July 22.  Lawrence Blanford Form 4, dated July 23, 2010, Blanford & Rathke Mem. in Supp. of Mot. to Dismiss Ex. 1, ECF No. 33-2.  It is difficult to read Plaintiffs' argument as consistent with Blanford's investment. Doing so would require the Court to infer that Blanford was either unaware of the ongoing fraud, unwilling to reap its rewards, or assisting Stacy and McCreary by making their suspect sales appear less suspicious.  All of those theories run counter to the thrust of the complaint, which charges Blanford and Rathke with fraudulently manipulating the Company's stock price. *See Russo*, 777 F. Supp. 2d at 519 ("the Complaint gives no indication as to why the Individual Defendants would have been motivated to defraud investors in order to enrich others, not themselves."); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 383-84 (E.D.N.Y. 2003) (finding it a factor weighing against scienter that the defendant company's CEO did not sell

shares at the same time other insiders did, when the CEO made most of the alleged misstatements and was thus best placed to profit from them).  While the Court cannot ignore their timing, especially Stacy's September sale, the factors surrounding the insider trades point against ascribing to the Company a fraudulent motive on that basis.

> 2. *Consummating the Class Period Transactions*

The second motive the complaint attributes to Defendants is gaining favorable terms in the deals GMCR signed during the Class Period with Lavazza and Van Houtte.  As the complaint describes, an inflated stock price would reduce the equity stake Lavazza could obtain in GMCR, since Lavazza had pledged to purchase $250 MM worth of GMCR stock, without regard to the corresponding quantity of shares.  Compl. ¶ 101.  Relatedly, Plaintiffs allege bolstering the Company's earnings would result in more favorable debt financing in the deal to acquire Van Houtte.  Compl. ¶ 100.

Typically, cultivating the appearance of profitability and entering into deals on the best terms are generalized motives that do not support scienter.  *ECA*, 553 F.3d at 201 ("Such generalized desires fail to establish the requisite scienter because 'the desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired,' *Kalnit,* 264 F.3d at 141, or to acquire another.");

23

*Dynex*, 531 F.3d at 196 ("we have consistently rejected" the "desire to maintain the appearance of profitability" as sufficient motive).  This principle makes intuitive sense because such transactions often could be at least as consistent with benefiting plaintiff shareholders as with defrauding them. *See Kalnit v. Eichler*, 264 F.3d 131, 141 (2d Cir. 2001) ("achieving a superior merger benefitted all shareholders, including the defendants.").

Inflating stock prices to cement deals can be a basis for scienter "'in some circumstances'" such as when there is "a unique connection between the fraud and the acquisition," *ECA*, 553 F.3d at 201 n.6 (quoting *Rothman v. Gregor*, 220 F.3d 81, 92-94 (2d Cir. 2000)).  Courts have found that "[s]tock sales that are unusual in scope or timing may support an inference of scienter." *In re ATI Tech., Inc. Sec. Litig.*, 216 F. Supp. 2d 418, 439 (E.D. Pa. 2002).  But that is not the case here.  The Van Houtte deal closed December 17, well outside the Class Period and more than a week after the 2010 10-K correcting the Company's earnings.  Plaintiffs fail to articulate motive when the deal was sealed after GMCR admitted its earnings were overvalued and restated them.

The Lavazza deal closed September 28—the last day of the Class Period.  In *In re ATI Technologies, Inc. Securities Litigation*, the Eastern District of Pennsylvania found motive

24

when the defendant company signed and closed a deal during the class period to acquire another company for $453 MM worth of common stock and options.  216 F. Supp. 2d at 439.  The plaintiffs there alleged the stock was overvalued: the defendant company would have had to issue over twice as many shares and options for the transaction than if it had closed after the defendant's corrective disclosures concerning inventory values. *Id.* at 439-40.

That case is unlike the Lavazza transaction, which closed as GMCR announced it was under investigation by the SEC and that it was reviewing its previous financial statements—poor timing, to say the least, if Defendants had intended to exploit the false Q3 Statements for profit.  In addition, the complaint does not allege that the revelations prompted any change in the terms of the Lavazza deal, or that either party had second thoughts.[12] Finally, absent from the complaint are allegations that the Individual Defendants would have benefitted personally from completing the transactions at an artificially high stock price,

---

[12]    Of course, alleging Lavazza or Van Houtte got a poor deal would not demonstrate that the class of GMCR shareholders who are the plaintiffs in this action were defrauded.  *ECA*, 553 F.3d at 200-01 (finding inapposite plaintiffs' reliance on a case "support[ing] the contention that excessive fees show motive to defraud *another* company's shareholders").  While Lavazza might theoretically be a member of the class in this case, as it purchased GMCR shares during the Class Period, at oral argument neither party believed that it was.  Tr. 41-42, 103.

making it even more tenuous to attribute scienter to them than
as to the Company as a whole.  *Rombach*, 355 F.3d at 177.
That the Company would make such allegedly damning disclosures
in the midst of completing significant transactions undermines
Plaintiffs' claim that the misstatements were aimed at boosting
GMCR's dealmaking prospects.

   B. Recklessness

      Recklessness is "'at the least, conduct which is highly
unreasonable and which represents an extreme departure from the
standards of ordinary care . . . to the extent that the danger
was either known to the defendant or so obvious that the
defendant must have been aware of it.'"  *Novak*, 216 F.3d at 308
(quoting *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38,
47 (2d Cir. 1978)) (internal quotations omitted).  It is "'a
state of mind *approximating actual intent* and *not merely a
heightened form of negligence*.'"  *S. Cherry St., LLC v.
Hennessee Group, LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quoting
*Novak*, 216 F.3d at 312).  A complaint will meet this standard if
it alleges "defendants knew facts or had access to non-public
information contradicting their public statements" and
"defendants . . . knew or should have known they were
misrepresenting material facts with respect to the corporate
business."  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63,
76 (2d Cir. 2001).  "Under certain circumstances," it can also

26

be met when "plaintiffs allege[] facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Novak*, 216 F.3d at 308. However, if the complaint fails to plead a motive to commit fraud, it must make a "'correspondingly greater'" showing of strong circumstantial evidence of recklessness. *ECA*, 553 F.3d at 198-99 (quoting *Kalnit*, 264 F.3d at 142) (internal quotation omitted).

Plaintiffs contend Defendants should have been aware of facts belying the Q3 Statements—in particular, the Company's poor accounting practices and its improper shipments to MBlock—and recklessly failed to act on them. Compl. ¶¶ 24, 89, 114. Corporate officers have a duty to disclose material information relevant to accounting practices and publicly-filed financial statements. *See Kalnit*, 264 F.3d at 143. But without further evidence of fraudulent intent, a restatement or accounting errors cannot demonstrate recklessness. *City of Brockton*, 540 F. Supp. 2d at 473; *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999). To show the failure to correct was reckless, Plaintiffs must adequately plead that Defendants "'had access to contrary facts'" and "'specifically identify the reports or statements containing this information.'" *Dynex*, 531 F.3d at 196 (quoting *Novak*, 216 F.3d at 309). To make that showing, Plaintiffs rely on the nature of the Individual

Defendants' positions with the Company and the contention, supported by CW statements, that they were on notice of poor practices within the Company before or during the Class Period.

Plaintiffs advance a theory known as the "Core Operations Doctrine." *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989). The doctrine provides that "if the subject-matter of the alleged misstatements is sufficiently 'significant' to a defendant company, it may be possible for knowledge of contradictory information (and thus, scienter) to be imputed to individual defendants even in the absence of specific information contradicting their public statements." *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 293 (S.D.N.Y. 2006). Plaintiffs allege that as CEO and CFO, Blanford and Rathke reasonably can be expected to know of problems with accounting systems and improper MBlock revenue recognition practices.

Courts differ on whether the Core Operations Doctrine survives the PSLRA. *See In re Atlas Air*, 324 F. Supp. 2d at 490 (applying the doctrine pre-*Tellabs*); *Bd. of Trs. of City of Ft. Lauderdale Gen. Emps. Ret. Sys. v. Mechel OAO*, No. 09-cv-3617 (RJS), 2011 WL 3502016, at *15 (S.D.N.Y. Aug. 9, 2011) (surveying post-*Tellabs* cases, noting decisions that have rejected the doctrine altogether, confined *Atlas* to its facts,

28

or applied it only when other information also supports scienter).

A recent decision within the Circuit addressing the issue determined that whether or not the doctrine survives, it cannot form the sole basis on which to find a strong inference of scienter, but only part of the "holistic assessment of the scienter allegations" required by *Tellabs*.  *Ft. Lauderdale*, 2011 WL 3502016, at *16; *see also New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, No. 10-cv-4702, 2011 WL 6823204, at *2 n.3 (2d Cir. Dec. 29, 2011) (summary order) (noting in dictum that such an approach accords with the decisions of the courts within the Circuit).

Applying that view, the Court need not address the difficult question of whether the Company's accounting systems and revenue recognition practices regarding MBlock were themselves "core operations."  It is possible that they are. *Cf. Celestica*, 2011 WL 6823294, at *2 ("inventory, especially when taken in relation to the company's overall sales, was key to measuring Celestica's financial performance and was a subject about which investors and analysts often inquired.").  However, even if the Court were to consider them core operations, the additional grounds for scienter the complaint offers are

insufficient to demonstrate an inference of scienter under the PSLRA.[13]

To show Blanford, Rathke, and the Company were on notice of wrongful revenue recognition at MBlock and general accounting difficulties, Plaintiffs offer the CW statements.  In *Novak*, the Second Circuit approved the use of anonymous sources, so long as plaintiffs describe the source in the complaint "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  216 F.3d at 314.  Since *Tellabs*, skepticism of using CW sources to prove scienter has grown.  *See Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 216 n.4 (2d Cir. 2010) (unpublished disposition in which the court, in dictum, found no error in the district court's decision ordering the plaintiffs' CWs deposed to confirm their allegations in order to decide a motion to dismiss, noting "[t]he anonymity of the sources . . . frustrates the requirement, announced in *Tellabs,* that a court weigh competing inferences to determine whether a complaint

---

[13]     Plaintiffs relatedly argue that Blanford and Rathke, as CEO and CFO, signed and certified the Q3 10-Q, obligating them to investigate the accuracy of GMCR's financials and the effectiveness of its disclosure controls.  But that still does not dispose of the general requirement that Plaintiffs allege facts available to Defendants that would have illuminated the falsities.  *Dynex*, 531 F.3d at 196; *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 304-05 (S.D.N.Y. 2008) ("[A] Sarbanes-Oxley certification is probative of scienter only if the complaint alleges specific contrary information.").

gives rise to an inference of scienter . . . ."); *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) ("Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist."); *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 516-17 (S.D.N.Y. 2011) (citing *Campo* and *Higginbotham* to discount plaintiffs' CW allegations, without considering the *Novak* framework).  More recently, however, the Second Circuit applied the *Novak* standard to find CW statements credible to support an inference of scienter. *Celestica*, 2011 WL 6823294, at *2-3.  Although the decision is unpublished, it adds additional weight to the fact that the Second Circuit has not overruled the test in *Novak*. The Court uses the *Novak* rule to evaluate the CW statements here.

The core of Plaintiffs' case comes from CW 1, a former "distribution planning manager" for GMCR who reported that GMCR's Vice President of Operations, Jonathan Wettstein, and Director of Operations, Don Holly, purposefully caused the Company to produce more products than customers demanded, sending the excess to MBlock warehouses.  Compl. ¶ 65.  CW 2, an ex-regional sales manager at GMCR also claimed product remained in warehouses past its expiration date and said that "anyone at the Company would acknowledge that MBlock, was, in essence, a captive company and would do as GMCR instructed."  Compl. ¶ 66.

31

Because of that practice, CW 1 further "believed that revenue was improperly recorded [by GMCR] on 'sales' to MBlock." Compl. ¶ 65.

CW 1 also specifically "indicated" that "GMCR improperly recognized revenue on 150 truck loads of product" sent to MBlock sometime in the first quarter of FY 2010 (which ended December 2009). Compl. ¶ 70. The basis for this belief was that CW 1 and other employees were "unable to locate the requisite paperwork . . . traditionally used by GMCR to validate the sale," leading to the inference that MBlock never paid for the products. Compl. ¶¶ 70-71. CW 1 estimated the truck deliveries carried $7.5-15 MM in product. Compl. ¶ 71. He also indicated that Wettstein, among other officials, knew of the shipment, and, as the complaint notes in parenthesis, that Wettstein "regularly provided updates to CEO Blanford." Compl. ¶ 71. CW 6, a VP of Operations at GMCR in 2010, told Plaintiffs that GMCR's accounting office asked him or her to record shipments to MBlock as a sale, even though CW6 did not know whether MBlock gained ownership of the products it received. Compl. ¶ 76.

Finally, the complaint notes that in May 2010 CW 1 was contacted by colleagues at GMCR asking whether he or she had been a whistleblower in an SEC investigation. Compl. ¶ 68.[14]

_____

[14]    Read most naturally, the complaint actually suggests it was CW 3, an MBlock employee from 2001-09 with undescribed

Plaintiffs contend this account belies GMCR's September 28, 2010
8-K disclosure that the Company was first contacted by the SEC
on September 20, 2010.  Compl. ¶¶ 68-69.

CW 1's account is lengthy and richly textured as to the
mechanics of the shipments, lending that portion credence.  As a
GMCR distribution planning manager during the time of the
alleged shipments, CW 1's background provides some basis to
believe he or she could have witnessed deliveries sent to
MBlock.

Nonetheless, CW 1's disclosed characteristics provide less
reason to believe that the 150 truckloads were wrongly marked as
revenues.  Plaintiffs did not allege that accounting was part of
CW 1's job description or that he or she had a background in the
subject.  *In re Accuray, Inc. Sec. Litig.*, 757 F. Supp. 2d 936,
948-49 (N.D. Cal. 2010) ("None of the CWs held financing or
accounting positions, so none was in a position to know when or
if revenue was recognized based on a particular deposit or how
often deposits were refunded.").  CW 1's conclusion of improper
revenue recognition rested solely on the fact that sales
paperwork was missing.  That CW 1 observed the deliveries and

responsibilities, not CW 1, who was contacted by the SEC in May.
*See* Compl. ¶¶ 67-68.  However, Plaintiffs in their opposition
brief, Opp'n 5, 25, 40, and at oral argument referred to the
witness as CW 1. Given the Court's obligation to read inferences
in Plaintiffs' favor and some ambiguity in the complaint's
language, the Court will attribute that statement to CW 1 for
purposes of deciding this motion.

could not locate the requisite paperwork does not provide
insight into how GMCR accountants recorded the shipments on the
Company's balance sheet.

CW 6 supported the general theory that MBlock shipments
were treated as sales, but the complaint alleges only that CW 6
worked at GMCR in 2010, not in 2009 at the time of the 150
truckloads described by CW 1.  While CW 6 "did not know if
MBlock ever owned the products shipped to it" because of its
"arms-length relationship" with GMCR, the complaint does not
specify whether the witness believed MBlock or third party
customers never paid for the product, as CW 1 contends with the
150 truckloads.  Compl. ¶ 76.[15]  In addition, the alleged

---

[15]   Plaintiffs also point to changes in GMCR's revenue
recognition policy as evidence of scienter.  GMCR changed its
revenue recognition policy in its 2010 10-K.  The 2010 policy
clarified that the Company marked revenue on Keurig goods only
"when the fulfillment entities ship the product based on the
contractual shipping terms."  Compl. ¶¶ 72-74; 2010 10-K at 49.
In 2009, the policy was ambiguous.  It stated only that revenue
was "recognized upon product delivery," but "in some cases"
booked "upon product shipment."  GMCR 2009 10-K, Opp'n Ex. J
("2009 10-K"), at 3, ECF No. 43-11.  However, unlike the 2010
10-K, which delineates separate policies for different types of
SCBU and Keurig sales, the 2009 10-K applies simply to
"wholesale and consumer direct sales."  2009 10-K at 3.  As
Defendants pointed out at oral argument, it is thus unclear
whether the 2009 policy relates to sales conducted through
fulfillment entities like MBlock.  Tr. 117-19.  Even if it did,
it is possible to read both statements harmoniously, assuming
that "shipment" in the 2009 statement refers to shipping from
MBlock to customers and not from GMCR to MBlock.  In fact, the
2010 10-K notes that "[t]itle to the product passes to the
fulfillment entity immediately before shipment to the
retailers."  2010 10-K at 49.  Regardless, reading the change in

34

accounting improprieties run counter to the restatement's
findings and PWC's independent review of GMCR's books, which
turned up no concerns with MBlock revenue recognition.
Plaintiffs have not quarreled with the adequacy of the
restatement or the independent audit.

The largest weakness in CW 1's account, however, is at
precisely the most relevant point: Defendants' awareness of the
falsity of the Q3 Statements.  Instructive by way of contrast to
this case is *Celestica*, which applied *Novak* to credit CW
accounts as to show recklessness.  2011 WL 6823204, at *3.  In
*Celestica*, the plaintiffs' claim was based on incorrect
inventory accounting that ultimately required defendant
Celestica to write off $30 MM worth of unsold goods stored at
its Monterrey, Mexico plant, as well as $60-80 MM in additional
costs related to a recent restructuring.  *Id.*

The plaintiffs presented evidence from confidential sources
whose positions "afforded them direct knowledge of Celestica's
inventory buildup during the class period," three of whom
"either provided information about rising inventory levels to
[the CEO and CFO] directly or participated in meetings where
they heard [the CEO and CFO] informed by others about the

---

the 2010 10-K as sinister still does not support a finding of
recklessness.  The policy change does not demonstrate a
connection between the false statements and facts available to
the Defendants to warn them that the statements were false.

company's inventory management problems." *Id.* at *1.  One CW
provided the CEO and CFO a spreadsheet indicating excess
inventory at the Monterrey facility.  *Id* at *2.  In addition,
the plaintiffs explained why, in light of the recent
restructuring and investor inquiries, inventory issues would be
important for the CEO and CFO to monitor.  *Id.*  The Second
Circuit found the complaint both explained how the defendants
were informed of the wrongfulness of their original statements
and why they should have been attentive to that information.
*Id.*

  Here, the complaint suggests merely how Defendants might
have known of improper treatment of the 150 truckloads: one
sentence stating that CW 1 alleges that Wettstein knew of the
shipments and that Wettstein regularly updated Blanford.  Compl.
¶ 71.  Taken as true, the statement does not clearly allege that
Wettstein knew the shipments were improperly recorded or, if he
did, that he told Blanford.  There is also no reference
whatsoever to Rathke's awareness of the shipments.  Those
missing links are fatal to establishing scienter by recklessness
as to MBlock, because the complaint does not show Defendants
were alerted to information contradicting the Q3 Statements.
*See In re Accuray*, 757 F. Supp. 2d at 948-49 (finding CW
accounts failed to prove recklessness in part because six of the
seven individual defendants had no contact with the CWs).

Similarly, the SEC investigation into GMCR's fulfillment entity revenue recognition policies near the end of the Class Period does not bolster CW 1's account. *De Oliveira v. Bessemer Trust Co.*, No. 09-cv-0713 (PKC), 2010 WL 1253173, at *6 (S.D.N.Y. Mar. 24, 2010). Plaintiffs assert Defendants were aware of the inquiry at the time of the Q3 Statements, relying CW 1's claim that GMCR employees had asked whether he or she had been a whistleblower "in an SEC investigation of GMCR" in May 2010, Compl. ¶ 68. However, that statement is not pled with adequate particularity either. First, CW 1 does not provide any information about the alleged May SEC review, and there is no particular reason to believe that CW 1 refers to the investigation into fulfillment entities that the Company disclosed on September 28. Second, CW 1 does not allege that senior officials at the Company, let alone the Individual Defendants, were on notice of the inquiry prior to the Q3 Statements.

Further still, the fact of an ongoing SEC investigation standing alone, even if it had been related to MBlock and known to the Defendants, is not enough to support a finding of recklessness. *See Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 740, 748-49 (9th Cir. 2008) (finding an SEC cease-and-desist order that described the defendant company's violations of the Foreign Corrupt Practices Act and criticized the company

for its lack of internal controls and proper training insufficient to support scienter).  It is particularly speculative to make that assumption here, where the SEC has issued no findings and the Company conducted an independently certified restatement of its financials that uncovered no errors related to MBlock.

The same infirmities plague the CW allegations related to accounting controls.  Plaintiffs offer statements from CWs 7-10 indicating that Keurig and SCBU used different accounting systems.  Compl. ¶ 82.  Plaintiffs argue this fact should have put the Company, Blanford, and Rathke on notice as to the inadequacy of its internal controls.  But only CW 10 opined that the multiple systems caused difficulties, saying "problems with intercompany transfers could arise."  Compl. ¶ 82.  CW 10 did not work for Keurig or SCBU, but rather was an "accounting manager" for "a roaster acquired by GMCR."  Compl. ¶ 82.  The complaint does not specify when CW 10's employer was acquired by GMCR or when he had access to GMCR's accounting platforms.  Finally, there is no mention whether senior officials were alerted to any problems.

Since the complaint does not plead with particularity any CW statements demonstrating that Defendants knew of problems in the Company's accounting systems and revenue recognition practices related to MBlock, it does not sufficiently allege

38

Defendants' scienter on the basis of recklessness.  In sum, the
Court concludes Plaintiffs have not adequately pled individual
grounds for scienter as to Blanford, Rathke, or the Company.
Nevertheless, *Tellabs* commands a holistic, comparative weighing
of the factors giving rise to scienter against parallel, non-
fraudulent explanations, and the Court now turns to that
analysis.

   C. *Tellabs* Comparative Analysis

     The combined facts amounting to an inference of scienter
must be "at least as compelling as any opposing inference of
nonfraudulent and nonreckless intent."  *S. Cherry St.*, 573 F.3d
at 111.  An innocent reading of the facts—suggested by the 2010
10-K—is that the lapses in disclosure controls and faulty
accounting were unintended consequences of the Company's rapid
growth.  In August 2010, *Fortune* magazine ranked GMCR as the
nation's second fastest growing company.  Compl. ¶86.  It had
acquired Timothy's Coffee of the World Inc. in November 2009 and
Diedrich Coffee, Inc. in May 2010, and announced the Van Houtte
deal during the Class Period, 2010 10-K at 11-12, all while
continuing to integrate Keurig, which it had acquired in 2006.

     After the Company was notified of the SEC investigation in
September 2010, it disclosed that fact to the market about a
week later and initiated an internal audit.  The audit, verified
by PWC, led to a restatement that was relatively small: the

ultimate value of the restatement's deductions was 6.2 percent of 2010 39-week revenues and $6.06 MM spread out between 2006 and 2010.  The fact that the restatement was a collection of several small mistakes, rather than a single, large error, also minimizes any fraudulent reading.  *See* 2010 10-K at 4-5. Moreover, Plaintiffs do not allege the largest error listed in the restatement, a $7.4 MM overstatement resulting from applying K-Cup inventory cost standards, *id.*, was itself the product of fraud.  Finally, after the Company admitted to mistakes, its stock rebounded and continued its rapid growth.

The benign explanation does not conclusively explain Stacy's and McCreary's stock trades, particularly Stacy's September 21 sale.  It also does not account for the 150 truckloads of product deposited at MBlock in CW 1's account.  On the balance, though, the Court finds that the optimistic view of the facts offers a more compelling reading of the events than the fraudulent one presented by Plaintiffs.  *Tellabs*, 551 U.S. at 324.  For that reason, it grants Defendants' motions to dismiss the § 10(b) count of the complaint.

Since the Court dismisses the § 10(b) claims, it must also dismiss the § 20(a) count, as Plaintiffs do not show an underlying violation of the securities laws.  *See Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) ("In order to establish a *prima facie* case of liability under § 20(a), a plaintiff must

show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).

In their brief and at the hearing, Plaintiffs requested any dismissal be without prejudice so they might amend their complaint.  Defendants did not object.  As such, the Court grants Plaintiffs' request for dismissal without prejudice and with leave to move to amend the complaint.  Thirty days would be sufficient time for Plaintiffs to evaluate their allegations in light of this opinion and determine whether to amend.

### Conclusion

For the foregoing reasons, the Court grants Defendants' motions to dismiss, but does so without prejudice to Plaintiffs to move to amend their complaint within 30 days.

Dated at Burlington, in the District of Vermont, this 27th day of January, 2012.

/s/ William K. Sessions III
William K. Sessions III
U.S. District Court Judge

41