UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

```
DAN M. HOROWITZ, et al.,        :
individually and on behalf      :
of all others similarly         :
situated,                       :
                                :
         Plaintiffs,            :        Case No. 2:10-cv-227
                                :        (Consolidated)
         v.                     :
                                :
GREEN MOUNTAIN COFFEE           :
ROASTERS, INC., et al.,         :
                                :
         Defendants.            :
```

Opinion and Order:
Defendants' Motions to Dismiss the Second Amended Complaint

This case involves a securities fraud class action brought
against Green Mountain Coffee Roasters, Inc. ("GMCR" or the
"Company") and two of its executives, CEO, Lawrence Blanford,
and CFO, Frances Rathke (collectively, the "Defendants").[1]  The
Plaintiffs allege that the Defendants violated § 10(b) of the
Exchange Act of 1934, which makes it unlawful for any person
"[t]o make any untrue statement of a material fact or to omit to
state a material fact necessary in order to make the statements
made, in light of the circumstances under which they were made,

---

[1] Blanford and Rathke will be referred to collectively as the
"Individual Defendants."  GMCR's founder and current Chairman of the
Board of Directors, Robert Stiller, was a defendant in the First
Consolidated Amended Class Action Complaint; however, he is no longer
a party to this action.  See Second Amended Consolidated Class Action
Complaint ("SAC"), ECF No. 72, ¶ 16-19.

not misleading." 17 C.F.R. § 240.10b-5 (implementing § 10(b)).[2]
Plaintiffs also allege the Individual Defendants were
"controlling persons," under § 20(a) of the Exchange Act of
1934, 15 U.S.C. § 78t(a).[3]

Plaintiffs' allegations center on GMCR's financial
statements for the third quarter of 2010, which Plaintiffs claim
were materially false and led them to purchase GMCR shares at
inflated prices during the Class Period. SAC ¶¶ 138-44. In an
Opinion and Order issued on January 27, 2012, the Court
determined that the Defendants' third quarter statements ("Q3
statements") were materially false but dismissed the Plaintiffs'
Consolidated Amended Class Action Complaint (the "First
Complaint"), ECF No. 26, without prejudice after finding that
the Plaintiffs' allegations did not give rise to a strong
inference of scienter.[4] *Warchol v. Green Mountain Coffee
Roasters, Inc.,* No. 2:10-cv-227, 2012 WL 256099, at *1 (D. Vt.

---

[2] For ease of reference, § 10(b) and 17 C.F.R. § 240.10b-5 are
collectively labeled throughout the opinion as "10b-5."

[3] That provision holds jointly and severally liable those defendants
who "directly or indirectly, control[ ]" persons who have violated the
securities laws, including 10b-5, unless "the controlling person acted
in good faith and did not directly or indirectly induce the act or
acts constituting the violation or cause of action." *Id.*

[4] "To state a claim under Rule 10b-5 for misrepresentations, a
plaintiff must allege that the defendant (1) made misstatements or
omissions of material fact, (2) with scienter, (3) in connection with
the purchase or sale of securities, (4) upon which the plaintiff
relied, and (5) that the plaintiff's reliance was the proximate cause
of its injury." *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493
F.3d 87, 105 (2d Cir. 2007). In this litigation, the Defendants have
challenged Plaintiffs ability to demonstrate the first two elements
but not the other three.

Jan. 27, 2012).  Whether the Plaintiffs have addressed that
deficiency is the sole issue presented here.

Despite the alterations made by the Plaintiffs, the Second
Amended Class Action Complaint (the "Second Amended Complaint"
or "SAC") does not contain sufficiently specific allegations
that collectively give rise to a "strong inference" of scienter,
and therefore fails to state a claim under the heightened
pleading requirements imposed by the Private Securities
Litigation Reform Act of 1995 ("PSLRA"), Pub. L. 104-67, 109
Stat. 737 (codified as amended a 15 U.S.C. § 78u-4(b)(2)(A)).
*See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308,
324 (2007) ("A complaint will survive . . . only if a reasonable
person would deem the inference of scienter cogent and at least
as compelling as any opposing inference one could draw from the
facts alleged.").  Accordingly, the Court again **grants**
Defendants' motions to dismiss, but this time does so with
prejudice.

## BACKGROUND

The putative class Plaintiffs seek to recover damages on
behalf of all purchasers of GMCR stock between July 28, 2010 and
September 28, 2010 (the "Class Period").

GMCR is a Delaware corporation headquartered in Waterbury,
Vermont that sells specialty coffee, coffee makers, and related
beverage products.  The Company's operations are divided into

3

two departments: (1) Keurig, which GMCR acquired in 2006, concentrates in selling a patented brewing device of the same name that produces ready-to-drink beverages from "K-Cups"—single serving portions of dried coffee, tea, or other products; and (2) the Specialty Coffee Business Unit ("SCBU"), which sells coffee in K-Cups and other types of packaging.

In recent years, the Company has experienced rapid growth, with its stock price rising from a low of $5.41 per share in Fiscal Year ("FY") 2008 to a high of more than $37 in FY 2010, just prior to the end of the Class Period.  GMCR 2010 10-K ("2010 10-K"), ECF No. 35-3, at *29.  In FY 2010, the Company made $1.36 billion in net sales, 2010 10-K at *31, and in August 2010, *Fortune* magazine recognized GMCR as number two on its list of the nation's hundred fastest growing companies.  SAC ¶ 108.

## I.   Class Period Events

The Class Period begins on July 28, 2010, the date that GMCR issued a press release announcing its financial results for its fiscal third quarter, including both the 13 and 39-week periods ending on June 26, 2010.  *Id.* ¶ 98.  In the release, GMCR announced that compared to the same quarter in 2009, its net sales had increased 64 percent to $311.5 million and its non-GAAP net income had increased 82 percent to $25.8 million. GMCR Reports Continued Strong Sales and Earnings Growth For Fiscal 2010 Third Quarter ("Q3 Press Release"), ECF No. 89-2, at

4

*1.  The market reacted positively to the reports: the following

day, the Company's share price rose nine percent, from $28.67 to

$31.36.  SAC ¶ 100.  On August 5, GMCR filed its 10-Q quarterly

financial statement with the SEC (the "Q3 10-Q"), signed by CEO

Blanford and CFO Rathke.  The Q3 10-Q stated that the Company's

management, including the CEO and CFO, had reviewed GMCR's

"disclosure controls and procedures" and that the CEO and CFO

found them "effective."  *Id.* ¶¶ 101, 105.

These figures proved inaccurate.  On September 28, 2010,

GMCR filed a Form 8-K disclosing the existence of an SEC inquiry

into the Company and announcing that it had discovered an

"immaterial error" in the accounting of intercompany K-Cup

inventory.  *Id.* ¶¶ 39, 40.  Less than two months later, on

November 19, 2010, GMCR issued a press release announcing that

investors "should no longer rely upon" the Company's financial

statements for 2007, 2008, 2009, and the first three quarters of

2010.  *Id.* ¶ 41.  The press release disclosed several errors,

including:

> A $7.6 million overstatement of pre-tax income, cumulative
> over the restated periods, due to the K-Cup inventory
> adjustment error previously reported in the Company's Form
> 8-K filed on September 28, 2010. . . .[5]

---

[5] The release explained that this misstatement was "the result of
applying an incorrect standard cost to intercompany K-Cup inventory
balances in consolidation" and resulted in the "overstatement of the
consolidated inventory and an understatement of the cost of sales."
*Id.* ¶ 114.

A $1.4 million overstatement of pre-tax income, cumulative over the restated periods, due to the under-accrual of certain marketing and customer incentive program expenses. . . .

A $1.0 million overstatement of pre-tax income, cumulative over the restated periods, due to changes in the timing and classification of the Company's historical revenue recognition of royalties from third party licensed roasters. . . .

An $800,000 overstatement of pre-tax income, cumulative over the restated periods, due to applying an incorrect standard cost to intercompany brewer inventory balances in consolidation. . . .

A $700,000 understatement of pre-tax income for the Specialty Coffee business unit, due primarily to a failure to reverse an accrual related to certain customer incentive programs in the second fiscal quarter of 2010. . . .

*Id.* ¶ 114.  In response to the announcement, the price of GMCR common stock fell $5.95 per share, or approximately 16 percent, to close at $31.06 per share on September 29, 2010.  *Id.* ¶ 133.

GMCR's errors prompted the Company to restate its prior period financial statements from 2006 to 2010 in a 10-K Form filed on December 9, 2010.  SAC ¶ 44.  The Company reported that it had overstated its income for the 39 weeks ending June 26, 2010 by approximately 6.2 percent.  *Id.* ¶ 116.  In the 10-K Form, the Company also acknowledged that it "did not have effective controls to ensure the completeness and accuracy of the accounting for intercompany transactions in its financial statement consolidation process."  *Id.* ¶ 117.

**II.  Confidential Witness Statements Regarding GMCR's Inventory Management and Revenue Recognition**

6

The Second Amended Complaint also contains a number of allegations about GMCR's inventory management and revenue recognition, most of which are based on statements from confidential witnesses ("CWs").

CW 1 was a GMCR distribution planning manager for the Company from 2009 to March 2010.  SAC ¶ 64.  CW 1 reported to Don Holly, GMCR's Director of Operations and also performed work for GMCR's Vice President of Operations, Jonathan Wettstein. *Id.*  In addition to noting several deficiencies in GMCR's management systems, CW 1 observed that GMCR did not have an inventory control system in place.  *Id.* ¶ 64(a).  CW 1 also attended weekly production meetings that included approximately twenty employees, including several senior managers, such as Holly and Wettstein.  *Id.* ¶ 64(c).  On several occasions, CW 1 confronted Wettstein about the Company's inventory processing practices because in CW 1's opinion, they were employing an inappropriate process for calculating product inventory for consumer products.  *Id.* ¶ 75

CW 1 also claims that during the quarter ending on December 26, 2009, GMCR improperly recognized revenue on 150 truckloads of coffee K-Cups that were shipped to MBlock, GMCR's primary fulfillment vendor; however the basis for CW 1's assertion is questionable.  *Id.* ¶ 71.  According to CW 1, he (or she) and

other Company employees were unable to locate the requisite paperwork traditionally used by GMCR to validate the sale, but there is no suggestion that CW 1 was in a position to confirm whether or not the shipment was actually booked as revenue and, if so, whether it was done so improperly.  Plaintiffs estimate that at the time of the shipment, the 150 truckloads of product would have been worth between $7.5 and $15 million and assert, again through CW 1, that several GMCR executives were aware of this shipment, including Wettstein, SBCU President McCreary and GMCR Vice President of Finance Tina Bissonette.  *Id.* 73.

Other confidential witnesses provided more limited insight into GMCR's relationship with MBlock.  For example, CW 2, a former regional sales manager for GMCR from late 2008 to late 2010, stated that MBlock was essentially captive to GMCR's demands.  *Id.* ¶ 65.  CW 4, a former employee of MBlock, explained that after 2009, GMCR represented over 75 percent of MBlock's business.  *Id.* ¶ 66.  And CW 6, who worked as a vice president for one of the company's roasters, as a consultant for Diedrich Coffee (acquired by GMCR in 2008), and also for GMCR, reported that GMCR's Vermont accounting department instructed CW 6 to book shipments from GMCR's Castroville plant to MBlock as sales; however, CW 6 was unsure whether MBlock ever owned the products shipped to it.  *Id.* ¶ 78.  Finally, CW 7, a lower-level shipping department employee in Knoxville, Tennessee, from 2009

8

to 2011 observed transfers of GMCR product that had no apparent
purpose. *Id.* ¶ 79.  CW 7 also witnessed the occasional disposal
of millions of K-Cups worth of products being dumped in
landfills near the Knoxville production plants.  *Id.* ¶ 80.

### DISCUSSION

## I.   Pleading Requirements

"To survive a motion to dismiss, a complaint must contain
sufficient factual matter, accepted as true, to 'state a claim
to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*,
556 U.S. 662, 668 (2009) (quoting *Bell Atlantic Corp. v.
Twombly*, 550 U.S. 544, 570 (2007)).  Determining whether a
complaint meets this standard requires that this Court engage in
a "context-specific" inquiry and "draw on its judicial
experience and common sense."  *Iqbal*, 556 U.S. at 679.
Generally, "[a] claim has facial plausibility when the pleaded
factual content allows the court to draw the reasonable
inference that the defendant is liable for the misconduct
alleged."  *Id.* at 663 (citing *Twombly*, 550 U.S. at 556).

In a 10b-5 action, a plaintiff must, among other things,
plead "that in connection with the purchase or sale of
securities, the defendant made a false representation as to a
material fact, or omitted material information, and acted with
scienter."  *S. Cherry St., LLC v. Hennessee Group, LLC*, 573 F.3d
98, 108 (2d Cir. 2009) (citing *Tellabs*, 551 U.S. at 318).  As a

check against abusive litigation, Congress enacted the PSLRA,
which established heightened pleading standards in actions for
private securities fraud.  *Tellabs*, 551 U.S. at 313.  Section
21(D)(b)(2) of the PSLRA provides that,

> [i]n any private action arising under this chapter in which
> the plaintiff may recover money damages only on proof that
> the defendant acted with a particular state of mind, the
> complaint shall, with respect to each act or omission
> alleged to violate this chapter, *state with particularity
> facts giving rise to a strong inference that the defendant
> acted with the required state of mind*.

15 U.S.C. § 78u-4(b)(2)(A) (emphasis added).

"To qualify as 'strong' within the intendment of §
21D(b)(2), . . . an inference of scienter must be more than
merely plausible or reasonable—it must be cogent and at least as
compelling as any opposing inference of nonfraudulent intent."
*Tellabs*, 551 U.S. at 314.  Accordingly,

> [t]he strength of an inference cannot be decided in a
> vacuum.  The inquiry is inherently comparative: How likely
> is it that one conclusion, as compared to others, follows
> from the underlying facts?  To determine whether the
> plaintiff has alleged facts that give rise to the requisite
> "strong inference" of scienter, a court must consider
> plausible, nonculpable explanations for the defendant's
> conduct, as well as inferences favoring the plaintiff.  The
> inference that the defendant acted with scienter need not
> be irrefutable, i.e., of the "smoking-gun" genre, or even
> the "most plausible of competing inferences," . . . .  Yet
> the inference of scienter must be more than merely
> "reasonable" or "permissible"—it must be cogent and
> compelling, thus strong in light of other explanations.

*Id.* at 323-24 (internal citations omitted).  Dismissal is
required where a complaint fails to meet this standard.  15

10

U.S.C. § 78u-4(b)(3)(A); *ATSI Communications, Inc. v. Shaar Fund, Ltd*, 493 F.3d 87, 99 (2d Cir. 2007) ("*ATSI*").

In conducting its inquiry, this Court presumes the facts alleged in the Second Amended Complaint and any documents incorporated or appended to it to be true and considers them in a holistic manner. *Tellabs*, 551 U.S. at 322-23. The Plaintiffs may rely on confidential sources in addition to other facts; however, the confidential sources must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).

## II.  Scienter Under the PLSRA

The Supreme Court has described scienter as "'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 & n.12 (1976)). Plaintiffs may demonstrate scienter on a showing of either: (1) "both motive and opportunity to commit the fraud" or (2) "strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99.

### A.  Motive and Opportunity

"Motive . . . [can] be shown by pointing to the 'concrete benefits that could be realized' from one or more of the

11

allegedly misleading statements or nondisclosures; opportunity
[can] shown by alleging 'the means' used and the 'likely
prospect of achieving concrete benefits by the means alleged.'"
*S. Cherry St.*, 573 F.3d at 108 (quoting *Shields v. Citytrust
Bancorp, Inc.*, 35 F.3d 1124, 1130 (2d Cir. 1994)).  Plaintiffs
may meet this burden by alleging that "corporate insiders . . .
misrepresented to the public material facts about the
corporation's performance or prospects in order to keep the
stock price artificially high while they sold their own shares
at a profit."  *Novak*, 216 F.3d at 308.  However, merely alleging
goals possessed by virtually all corporate insiders "such as the
desire to maintain high credit rating for the corporation or
otherwise sustain the appearance of corporate profitability" is
insufficient to plead motive.  *S. Cherry St.*, 573 F.3d at 109.

In *Warchol*, 2012 WL 256099 at *7-9, the Court determined
that the fraudulent motives posited by Plaintiffs—permitting
insider stock sales and gaining leverage for the Company in
Class Period transactions—were insufficient to create an
inference of scienter.  Because the Plaintiffs' allegations of
motive and opportunity are in substance identical to those in
their First Complaint, Plaintiffs still have not adequately
pleaded scienter under this theory.[6]

---

[6] The only significant addition relevant to motive and opportunity
appears in Plaintiffs' opposition to Defendants' motions to dismiss

**B.    Strong Circumstantial Evidence of Conscious Misbehavior or Recklessness**

Alternatively, scienter can be established by demonstrating a defendant's reckless disregard for the truth.  *S. Cherry St.*, 573 F.3d at 109.  This requires showing "'conscious recklessness—*i.e.*, a state of mind *approximating actual intent*, and *not merely a heightened form of negligence*.'"  *Id.* (quoting *Novak*, 216 F.3d at 312 (internal quotation marks omitted) (emphasis in original)).  To meet this standard, Plaintiffs must allege conduct that "'is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2000) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)).  In essence, this requires showing that

the SAC, where Plaintiffs argue that both Blanford and Rathke were motivated to overstate sales and operating income to achieve bonuses of up to 150 percent and 82 percent of their respective 2010 base salaries.  Pl. Opp. to Def. Mot. to Dismiss, ECF No. 82, at *37.  These factual allegations appear in Plaintiffs' memorandum rather than their complaint and are therefore not properly pleaded.  Even if the Court were to disregard that procedural deficiency the motive alleged is inadequate to support an inference of scienter.  *See, e.g. ECA, Local 134 IBEW Joint Pension Trust of Chicago v. J.P. Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009) ("If scienter could be pleaded solely on the basis that defendants were motivated because an inflated stock price or improved corporate performance would increase their compensation, 'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions. [I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated.'") (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995)).

the defendants "knew facts or had access to information
suggesting their public statements were not accurate" or "failed
to check information that they had a duty to monitor." *Novak*,
216 F.3d at 311.  If the complaint fails to plead a motive to
commit fraud, a plaintiff must make a "'correspondingly
greater'" showing of strong circumstantial evidence of
recklessness.  *ECA, Local 134 IBEW Joint Pension Tr. Of Chicago
v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009)
(quoting *Kalnit v. Eichier*, 264 F.3d 131, 142) (2d Cir. 2001)
(internal quotation omitted)).

**III. The Present Case**

  **C.   The Individual Defendants**

  The Second Amended Complaint largely repeats the
allegations regarding the Individual Defendants that were
presented in the First Complaint.  Plaintiffs again rely on the
Individual Defendants' roles in the company was well as CW
statements suggesting that they may have been on notice about
poor practices within the company.  Only a few of the revised
paragraphs address information known to Blanford or Rathke, but
none of them contain particularized allegations about the state
of mind of either of the Individual Defendants.  *See* SAC ¶¶ 18,
20, 51 n.4, 74, 104(c).[7]

---

[7] Paragraph 18 adds details about Rathke's background, including the
fact that the GMCR website stated she was a Certified Public

Relying once more on CW 1's statements, Plaintiffs allege
that Blanford and Rathke attended weekly or bi-weekly meetings
where decisions were made concerning the types of products that
would be produced, where that production would occur, where the
product would be stored, the management of the inventory, and
the disposal of excess inventory.  *Id.* ¶ 74.  According to CW 1,
"the Company's revenue recognition practices and policies were
discussed" at some of these meetings in November and December of
2009.  *Id.*  The Second Amended Complaint also alleges that
inventory errors were known "to employees who reported directly
to Defendant Rathke" but stops short of describing any specific
conversation or report that would have alerted Rathke to that
fact.  *Id.* ¶ 104.  Instead, the Plaintiffs simply identify
Rathke as a member of senior management who, because of her
position, must have been aware of inventory control.  *Id.*  Nor
do Plaintiffs ever explain, either in the SAC or in their

_____

Accountant ("CPA") even after her license had expired.  SAC ¶ 18.  In
paragraphs 20 and 51, Plaintiffs emphasize Blanford and Rathke's role
in certifying the Company's SEC filings and statements regarding the
effectiveness of GMCR's internal controls. *Id.* ¶¶ 20, 51 n.4.
Paragraph 74 asserts that Blanford and Rathke regularly attended
weekly or bi-weekly meetings where production levels were discussed
and set.  *Id.* ¶ 74.  Finally, in paragraph 104, Plaintiffs allege that
one employee who reported to Rathke told one of Plaintiff's
confidential witnesses that senior management was aware of the
problems with the Company's computer systems used for inventory
management.  *Id.* at 104(c).  Although the Court considers the
Plaintiffs' allegations in the SAC holistically, these passages make
clear that the adjustments Plaintiffs have made to their claims
against the Individual Defendants are minor and ultimately
inconsequential.

memoranda, what specific reports or information presented at these meetings would have alerted Blanford or Rathke to the falsity of their Q3 statements.

Even if the Court assumes that the Individual Defendants were present at the weekly or bi-weekly meetings and that revenue recognition policies were discussed, those facts are insufficient to establish that the Individual Defendants knew or should have known of the material falsity of the Q3 statements in July and August of 2010. As this Court explained in *Warchol*, Plaintiffs' failure to establish that Blanford and Rathke had knowledge that shipments to MBlock were being recognized as revenue is fatal to their assertion that the two were aware of information contradicting the Q3 statements. *See* 2012 WL 256099 at *13-14. Because the Second Amended Complaint includes no particularized allegation that either Blanford or Rathke knew or should have known of any problems with GMRC's accounting system or its revenue recognition practice regarding shipments to MBlock, it must be dismissed with respect to both of them.

Plaintiffs repeat arguments relating to the "core operations doctrine,"[8] which provides that "if the subject-matter of the alleged misstatements is sufficiently 'significant' to a defendant company, it may be possible for the knowledge of

_____

[8] This April, the Second Circuit left open the question of whether the core operations doctrine remains valid. *See Frederick v. Mechol OAO*, 475 Fed. App'x 353, 356 (2d Cir. 2012).

16

contradictory information (and thus, scienter) to be imputed to
individual defendants even in the absence of specific
information contradicting their public statements." *In re
eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 293 (S.D.N.Y.
2006). Plaintiffs claim that because the Individual Defendants
were signatories to SEC filings, they had a duty to familiarize
themselves with facts relevant to the core operations of the
company—including accounting and revenue recognition practices
at GMCR. *See In re Atlas Air Worldwide Holdings, Inc. Sec.
Litig.*, 324 F. Supp. 2d 474, 491 (S.D.N.Y. 2004). The
difficulty is that the core operations doctrine "does not
dispose of the general requirement that Plaintiffs allege facts
available to Defendants that would have illuminated the
falsities." *Warchol*, 2012 WL 256099, at *11 n.13 (citing
*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital
Inc.*, 531 F.3d 190, 196 (2d Cir. 2008)). Though the Second
Amended Complaint includes more details from confidential
witnesses about GMCR's inventory management and the 150
truckload shipment to MBlock, the Plaintiffs still fail to
allege facts showing that the Individual Defendants should have
been aware that shipments were being improperly recorded as
revenue and therefore knew that the Company's third quarter 2010
financial statements were false. Indeed, Plaintiffs have not
explained how the improper booking of any shipment, much less

17

the December, 2009 shipment of 150 truckloads to MBlock, has any relationship to the financial misstatements they have identified.  Plaintiffs' strongest claim may be that the MBlock shipment should have made the Individual Defendants aware of the falsity of their representations that GMCR's internal control and procedures were effective; however, a lack of paperwork for one shipment more than half a year before the Class Period hardly creates a strong inference that Blanford and Rathke were reckless in asserting the reliability of GMCR's enterprise-level accounting practices.

Because Plaintiffs have not pleaded sufficient facts establishing the scienter of the Individual Defendants, both counts against them are dismissed.[9]

**D.   GMCR**

"A corporate defendant's scienter is necessarily derived from its employees."  *In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) (citing *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001)).  "While there is no simple formula for

---

[9] The Individual Defendants are not liable under Section 20(a) of the Exchange Act unless there is an underlying violation of a securities law.  *See Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) ("[T]o establish a prima facie case of liability under § 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation.") (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).

how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants." *In re Marsh & Mclennan*, 501 F. Supp. 2d at 481.  To plead GMCR's scienter, Plaintiffs may allege facts creating a "strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter," even if that person is not an Individual Defendant.  *Dynex,* 531 F.3d at 195-96.  Plaintiffs may plead scienter with respect to GMCR even "in the absence of successfully pleading scienter as to an expressly named officer."  *Id.* at 196.

In terms of the allegations that pertain to GMCR's scienter, the Second Amended Complaint differs from the First Complaint in four relevant respects: it includes more detailed pleadings about the background and knowledge of CW 1, *see, e.g.* SAC ¶¶ 64, 71-77; it provides limited corroborating statements by other CWs, *see, e.g. id.* ¶¶ 64(c), 69, 71 n.7, 78, 79, 104; it includes various third-party accounts of the SEC's investigation into GMCR and the Company's restatement, *see id.* ¶¶ 84-97, 128; and it alleges that GMCR engaged in deliberate overproduction that should have made GMCR aware of the material falsity of its misstatements, *see id.* ¶ 80.  Nevertheless, the Second Amended Complaint suffers from the same fundamental flaw as the First Complaint.  It contains no particularized

19

allegations showing that GMCR knew or should have known that its public statements were false.

The Second Amended Complaint alleges that CW 1's position as a distribution planning manager at one of GMCR's facilities included some basic accounting responsibilities, that he or she was knowledgeable about accounting rules for revenue recognition, and that he or she attended weekly production meetings where GMCR's production and inventory levels were discussed. SAC ¶¶ 64, 74. But none of these allegations relate to the accounting practices that are fundamental to Plaintiffs' theory of misrepresentation. There is no reason to think that CW 1, by virtue of his or her position or by reference to the details of his or her statements, has knowledge of the enterprise-level accounting at GMCR. In other words, Plaintiffs' allegations still do not set forth "with sufficient particularity . . . the probability that a person in the position occupied by the [confidential] source would possess the information alleged." *Novak*, 216 F.3d at 314. Concededly, the Second Amended Complaint does include particularized allegations concerning GMCR's inventory process practices, including CW 1's claim that the Company was using a sub-optimal methodology for setting its inventory targets; however, that fact is insufficient to establish a strong inference that GMCR and its employees should have known that its financial statements for

the third quarter of 2010 were false.  Plaintiffs still have not
alleged facts demonstrating that any of the individuals
responsible for releasing the Company's Q3 statements were
confronted with information that should have made the Company
aware of their material falsity.

The allegations concerning the other confidential witnesses
corroborate aspects of CW 1's account but do little to
strengthen Plaintiffs' inference of scienter.  CW 6 states that
a significant amount of the production from one GMCR plant "was
shipped to MBlock and, as far as CW 6 knew, was booked as a
sale," SAC ¶ 78.; however, there is again no reason to believe
that CW 6 was in a position to know whether or not GMCR
improperly booked those shipments as revenue.  Nor do CW 6's
statements provide much support for CW 1's because the two refer
to different events; CW 6 only began working at GMCR in 2010,
which was after the 150 truckload shipment that CW 1 states was
improperly booked as revenue. *Warchol*, 2012 WL 256099, at *13.
Similarly, the Plaintiffs allege that CW 7, a lower-level
employee in GMCR's shipping department, witnessed "improper
transferring of product from one plant to the next for no
apparent reason"; however, Plaintiffs again fail to explain how
CW 7 would have been in a position to know that those transfers
were improper or, more significantly, how CW 7's statements
suggest that the Company should have been aware of the

misstatements it made.  SAC ¶ 79.  Finally, with the support of
three additional confidential witnesses, CW 11, CW 12, and CW
13, Plaintiffs suggest that GMCR used multiple computer systems
to manage the company's system, which sometimes led to double
counting.  *Id.* ¶ 104(a)-(c).  But the Plaintiffs also allege
facts showing that the Company took steps to ensure its figures
were accurate despite the problems created by using multiple
computer systems.  *See id.* ¶¶ 104(b), 104(c).  As the Defendants
note, these pleadings are actually consistent with an inference
of non-culpability.  The Company and its management appear to
have been working to ensure the accuracy of inventory reports
despite facing difficulties with the software they were using.

Plaintiffs also incorporate a series of third-party
statements about GMCR's accounting practices from industry
observers.  The most notable of these come from a presentation
given on October 17, 2011 by David Einhorn, the founder and
president of a hedge fund.  SAC ¶¶ 87-91.  Einhorn's
presentation relies on confidential sources much like those
referenced elsewhere in the Second Amended Complaint; however,
there is little information with which this Court might assess
the reliability of the sources Einhorn cites.  Even basic
information, such as their terms of employment, their
responsibilities, or their superiors at GMCR, is not disclosed
by Einhorn.  Those sources therefore fail to satisfy the *Novak*

22

standard for confidential witness allegations and cannot support a strong inference of scienter.  *See* 216 F.3d at 314.

In addition, Plaintiffs assert that GMCR engaged in deliberate overproduction and that knowledge of such overproduction should have made the Company aware of the falsity of its Q3 statements, but the factual premise for these assertions is thin.  Plaintiffs' theory relies heavily on generalized allegations by CW 1 that the company engaged in overproduction, though they also state that CW7 witnessed the disposal of "millions of K-Cups" worth of products in landfills near the GMCR's Knoxville, Tennessee production plants.  SAC ¶ 80.  Yet the disposal of significant quantities of expired product is hardly surprising for a company that produces massive quantities of perishable goods.  And while GMCR's year-over-year inventory was 80 percent higher for the quarter ending in June 2010, *id.* ¶ 53, its year-over-year sales also grew by 63 percent during the same period.  *Id.* ¶¶ 53-54.  Most significant, though, is the Plaintiffs' failure to demonstrate how knowledge of the overproduction they allege should have made GMCR aware of any falsities in its public representations.  In fact, the Second Amended Complaint does exactly the opposite: it notes that in a July 28, 2010 conference call, Defendant Blanford indicated that GMCR was ramping up its inventories in anticipation of increased demand in the fall season.  *Id.* ¶ 54.

23

Plaintiffs argue that the present case is similar to *New Orleans Employees Retirement System v. Celestica, Inc.*, 455 Fed. App'x 10, 13 (2d Cir. 2011), where the Second Circuit found that plaintiffs reversed the dismissal of a 10b-5 claim that relied on a theory of overproduction; however, *Celestica* is distinguishable for two reasons.  First, because *Celestica* involved misrepresentations about the volume of a company's unsold inventory, allegations that the defendants knew of systemic overproduction had direct bearing on the plaintiffs' showing of scienter.  *Id.* at 13.  In the instant case, the connection is far more attenuated: the Plaintiffs claim that GMCR should have known that its generalized financial statements were likely to be false because GMCR's leadership was allegedly aware of existing problems with the Company's inventory management.  The second, and perhaps more critical difference, is the credibility of the confidential witnesses in the two cases.  In *Celestica*, the plaintiffs identified CWs who had direct knowledge of inventory buildup and who had provided information (or witnessed information being provided) to the defendants that contradicted the company's public representations.  *Id.*  By contrast, the CWs in the present case neither had direct knowledge of GMCR's enterprise-level accounting practices nor have they identified specific

24

information about GMCR's production that should have made the Company aware that its Q3 statements were materially false.

The Plaintiffs offer one final argument: that the scienter of additional corporate officers, namely Wettstein and Bissonette, may be imputed to the Company. Although there does not appear to be a Second Circuit case directly on point, several district courts have concluded that plaintiffs pleading securities fraud cases may rely on the collective knowledge and intent of its employees. *See Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 486 n.205 ("[A] complaint may adequately allege corporate scienter without alleging scienter as to any particular defendant."); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 281 (S.D.N.Y. 2008). The problem for Plaintiffs, though, is that the Second Amended Complaint does not provide any particularize allegations that either Wettstein or Bissonette was apprised of any information regarding when or even if the 150 truckload shipment to MBlock was recognized as revenue. Instead, Plaintiffs merely repeat the generalized assertion that senior management, including Wettstein and Bissonette, were aware of the shipment. SAC ¶ 73. Even when combined with the confrontations that CW 1 had with Wettstein about whether the Company was using an appropriate process for managing its inventory, *see* SAC ¶¶ 75-77, that allegation is

25

insufficient to create a strong inference that GMCR should have been aware of the falsity of its Q3 statements.

For these reasons, Plaintiffs also have not met the PLSRA pleading requirements for their count against GMCR.

## C.   *Tellabs* Comparative Analysis

The combined facts amounting to an inference of scienter must be "at least as compelling as any opposing inference of nonfraudulent and nonreckless intent." *S. Cherry St.*, 573 F.3d at 111 (quoting *Tellabs*, 551 U.S. at 314).  Despite the changes incorporated by plaintiffs in the Second Amended Complaint, the inference of the Defendants' scienter they seek remains less compelling than the innocent one this Court identified in *Warchol*: that the lapses in GMCR's disclosure controls and accounting practices were unintended consequences of the Company's rapid growth.  *See* 2012 WL 256099 at *15. Accordingly, the Court persists in its initial judgment that the Plaintiffs have not established the strong inference of scienter required by *Tellabs*, 551 U.S. at 324, and dismisses the 10b-5 count.

**CONCLUSION**

For the forgoing reasons, the Court **grants** the Defendants'

motions to dismiss the Second Amended Complaint with prejudice.

Dated at Burlington, in the District of Vermont, this 20th

day of March, 2013.


/s/William K. Sessions III
William K. Sessions III
U.S. District Court Judge